\*DEWEY WILSON AND MARGARETTE M. WILSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7611–74, 5720–75, 5773–75.     Filed April 21, 1981.

*F. Thomas Huster*, for the petitioners.
*Eugene H. Ciranni*, for the respondent.

GOFFE, *Judge*: The Commissioner determined the following deficiencies in and additions to the Federal income tax of the petitioners:

DEWEY AND MARGARETTE M. WILSON

Docket No. 7611–74

| Taxable year | Deficiency | Addition to tax Sec. 6653(b)[2] |
|---|---|---|
| 1972 | $63,614.31 | $31,807.15 |

---

*Supplemental Opinion appears at 77 T.C. 324 (1981).

[1]Cases of the following petitioners have been consolidated herewith: Margarette M. Wilson, docket No. 5720–75; Dewey Wilson, docket No. 5773–75.

[2]All section references to the Internal Revenue Code of 1954 as amended.

MARGARETTE M. WILSON

Docket No. 5720–75

| Taxable | | | Additions to tax | | |
|---|---|---|---|---|---|
| year | Deficiency | Sec. 6653(b) | Sec. 6651(a)(1) | Sec. 6653(a) | Sec. 6654 |
| 1970 | $4,013.87 | 0 | $401.39 | $247.62 | 0 |
| 1971 | 5,259.67 | 0 | 1,314.92 | 262.98 | $168.32 |

DEWEY WILSON

Docket No. 5773–75

| Taxable | | | Additions to tax | | |
|---|---|---|---|---|---|
| year | Deficiency | Sec. 6653(b) | Sec. 6651(a)(1) | Sec. 6653(a) | Sec. 6654 |
| 1969 | $2,410.61 | 0 | $602.65 | $120.53 | $77.14 |
| 1970 | 5,147.06 | 0 | 1,286.77 | 257.35 | 164.70 |
| 1971 | 6,525.26 | $3,262.63 | 0 | 0 | 0 |

The issues are:

(1) Whether petitioners spent less than $65,013 in 1972 to purchase narcotics which were found in their home and seized by police in that year;

(2) Whether petitioner Dewey Wilson (Dewey) had $20,000 in a safe-deposit box on January 1, 1969, which the Commissioner failed to take into account in computing Dewey's gross income using the "net worth" method;

(3) Whether Dewey provided $7,500 cash from his own assets to pay for a bail bond posted in order to obtain his release from jail in 1972, or whether the bail bond money was a gift or loan from one of Dewey's relatives;

(4) Whether any part of the underpayment of tax required to be shown on Dewey's separate 1971 return was due to fraud; and

(5) Whether any part of the underpayment of the tax required to be shown on petitioners' 1972 income tax return was due to the fraud of Dewey, Margarette, or both.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

At the times their various petitions in these cases were filed, the petitioners were residents of the State of California.

Dewey never filed Federal income tax returns for his taxable

year 1969 or 1970. He did file a return for his 1971 taxable year. Margarette filed a return for her 1970 taxable year. She failed to file a return for her 1971 taxable year. For the taxable year 1972, Dewey and Margarette filed a joint Federal income tax return.

At the outbreak of World War II, Dewey was working as a chief steward on an intercoastal freighter. During the war, he served as a lieutenant in the Merchant Marine on troop ships. His wartime duties were those of a chief steward. He was in charge of all food, housing, and clothing for 5,000 troops for 60 to 90 days while they were aboard ship. He supervised and directed 250 to 300 employees on a typical voyage.

As an employee of our wartime Merchant Marine, Dewey was provided with food, lodging, and clothing, and, in addition, received a cash salary and cash bonuses which he saved and deposited in a safe-deposit box at the Day and Night Branch of the Bank of America in San Francisco, Calif. By the close of the war, he had hoarded 50 to 60 thousand dollars. He spent most of this fund in acquiring real estate.

The total purchase price of a lot on Post Street in San Francisco which Dewey acquired on August 4, 1970, was $19,716.80. The balance of the mortgage loan outstanding on this lot as of December 31, 1970, was $12,094.64. Dewey acquired a lot on Fulton Street in San Francisco on March 2, 1971.

On February 15, 1974, Gary Reynolds, an internal revenue agent, interviewed Dewey. Dewey stated to Agent Reynolds that he had zero cash on hand as of December 31, 1968, and as of December 31, 1969.

On July 31, 1970, in connection with their purchase of an automobile, both petitioners signed a credit application for a $1,464.51 loan on which each reported an income of $800 per month (total income of $1,600 per month).

On May 18, 1971, in connection with her purchase of an automobile, Margarette signed a credit application on which she reported a monthly income of $1,200.

On July 31, 1971, in connection with his purchase of an automobile, Dewey signed an application for a loan of $3,421.28 on which he claimed a monthly income of $2,000.

During their taxable years 1969 through 1972, petitioners engaged in the trade or business of buying and selling narcotics. In 1971 and 1972, they derived gross income from this trade or

business, none of which they reported on their Federal income tax returns. They maintained no records of their income from narcotics transactions.

During the 23-year period from 1945 to 1968, Dewey purchased rental properties subject to mortgages, made mortgage payments, collected rent, and filed income tax returns reporting his interest expenses and rental income.

In 1971 and 1972, petitioners operated a business known as the Kansas City Hickory Pit Restaurant, from which Dewey received wages of $3,230 during 1972. On a W–2 form attached to Dewey's 1971 Federal income tax return, Margarette is designated as the owner of the restaurant.

In 1971 and 1972, Margarette operated businesses known as Margarette's Salon Continental, a beauty shop, and Brothers & Sisters, an after-hours social club.

Margarette did not help prepare any of the income tax returns mentioned above. Her separate 1970 return was prepared by George Tyrrell from information which she furnished to him. She has filed other separate returns during her marriage to Dewey. She filed individual returns prior to her marriage. Dewey's separate 1971 income tax return and petitioners' joint 1972 income tax return were prepared by George Tyrrell. Dewey, however, "did all the footwork" necessary to prepare the returns and took the information to Tyrrell. Dewey filed these returns with the Internal Revenue Service.

During 1972, petitioners caused certain funds that they owned to be held in the names of other persons. As of December 31, 1972, $48,054.93 of petitioners' funds were held by nominees.

Margarette is a high school graduate. She attended business college following high school.

On November 30, 1972, both petitioners were arrested and charged with possession of, and possession with intent to sell, narcotics. They were subsequently convicted of these crimes and have served prison sentences as a result. Upon making the arrest, the police confiscated from petitioners 576 grams of powder which contained heroin, and 1,142.97 grams of powder which contained cocaine. Upon Dewey's arrest, a $7,500 bond was posted for his release from custody. In a letter he wrote to the judge who presided at his criminal trial, Dewey stated, "I have spent all of my money on attorneys and bail bondsmen."

In his interview with Dewey, Agent Reynolds inquired of him

what he had spent on various categories of expense during 1972. Dewey answered with statements as to the specific amounts he had spent for the items named by Reynolds. In the course of this inquiry, Reynolds asked what the amount of bail paid was, and Dewey responded that $7,500 was paid for bail. Reynolds did not specifically inquire as to the source of the bail funds.

On or about July 30, 1972, Dewey fell from a ladder and struck his head. He was hospitalized at Children's Hospital in San Francisco from July 31 to August 7, 1972. His attending physician was Dr. Leo Kimbrough, Dewey's family doctor. Dr. Kimbrough was a medical doctor specializing in internal medicine. He was neither a psychiatrist nor a neurologist and had no special training in either psychiatry or neurology. On August 1, 1972, a Dr. Shev, of whom Dr. Kimbrough had requested a consultation concerning Dewey's medical condition, saw Dewey and noted that he was oriented as to time, person, and place. The final diagnosis upon discharge was "cerebral contusion, congestive heart failure, and metabolic alkalosis." Prior to discharge on August 7, 1972, Dewey had considerably improved. After hearing of the death of his wife's sister on August 19, 1972, Dewey became unsteady on his feet, impaired in memory, depressed, and tearful, had a "crazy" look on his face, and was inclined to fall alseep easily. He was admitted to Saint Francis Memorial Hospital in San Francisco on August 21, 1972, and was discharged on October 2, 1972. On August 23, 1972, a Dr. G. O. Cross saw Dewey in consultation with Dr. Kimbrough, and noted that he was unable to obey simple commands such as to follow the movement of a finger, move his feet, or tell the difference between dull and sharp stimulation of his face. Dewey was examined in consultation with Dr. Kimbrough by a Dr. Richard Kunin on September 23, 1972, who described Dewey's condition as follows:

Examination reveals him to be * * * clearly depressed and retarded. Speech is reduced to mono-syllabic answers to questions and with no spontaneous thought production. * * * On * * * 13 Sept. he was unable to communicate even with his wife. This in spite of the fact that she insisted that he communicated normally with her but clammed up with the hospital staff because he mistrusted them and "don't want to be bothered." He burst into tears when she focused on his being in the hospital and on his dislike for procedures. Affect appears to be labile. Intellectual functions normally at above average level. He is clearly disoriented and semi-stuporous at the time of this examination, seemingly almost drifting to near sleep levels during

conversation. He appears confused by simple conversation and his wife frames everything into yes-no questions for him. At that time he was unable to remember her name! When asked to open his mouth he did so but he was unable to protrude his tongue on command. * * *

Towards the end of his stay at Saint Francis, Dewey showed marked improvement. On September 25, 1972, the attending nurse observed that he was responding more intelligently verbally. On September 26 and 27, he responded more quickly to verbal stimuli, appeared to be alert, and spoke coherently. On September 28, 30, and October 1, the nurse remarked that he was able to feed himself quite well. On September 30, he walked in the hall without assistance. On October 2, he appeared to be more alert and was discharged to a nursing home. During his stay, Dewey was examined by several neurologists and neurosurgeons. His final diagnosis was a "viral encephalopathy," a viral inflammation of his brain tissue.

Dewey was again admitted to Children's Hospital on November 5, 1972, and was discharged on November 10, 1972. On November 5, Dewey experienced a severe left occipital headache, a stuffy nose, and increasing weakness of his left side. Upon admission, he appeared to be somnolent, confused, and disoriented to time and place. During his stay, he was examined by a neurologist whose impression was that he had a viral encephalopathy. By November 8, he was alert, oriented, without complaints, and ready for discharge.

From the time of his discharge on November 10, 1972, until March 6, 1973, Dewey was not hospitalized, but Dr. Kimbrough saw him every 4 or 5 days. Dr. Kimbrough was not present either when Dewey consulted George Tyrrell concerning the preparation of petitioners' 1972 return or when Dewey filed the return. There are no medical records concerning Dewey from this time period. Dewey filed petitioners' 1972 return on February 20, 1973. On March 6, 1973, an electroencephalogram (EEG) was performed on Dewey. The physician was of the impression that the results were probably normal.

On April 9, 1973, Dewey was readmitted to Saint Francis Hospital and was discharged on April 13, 1973. He was experiencing fever, dizziness, chills, severe headaches, blurring of vision, and mental confusion. Dr. Kimbrough examined him on April 9 and noted that he had become more and more confused in recent weeks and had almost a complete loss of memory. Also on

April 9, an EEG was performed on Dewey. The physician administering the EEG reported that there was no evidence of focal brain pathology, and that the record had returned to normal in comparison with earlier EEGs. By April 13, Dewey was alert and responsive. He was ambulatory upon discharge and left the hospital on his own. The final diagnosis was "post encephalitis syndrome, chronic brain syndrome, mental confusion, and hepatomegaly."

Dr. Kimbrough observed Dewey from his fall in 1972 until his criminal trial in May 1973, and concluded that Dewey was suffering from encephalitis, which was responsible for his disorientation and emotional lability. Due to his condition, in Dr. Kimbrough's opinion, Dewey was at no time during this period capable of forming any sort of legal intent. Dr. Kimbrough believes that behavior of an encephalitis victim can vary and an encephalitic can have good days and bad days. Dewey's criminal trial in connection with the narcotics charge resulting from his November 1972 arrest was held from May 7 through May 31, 1973. Dr. Kimbrough observed that Dewey continued to exhibit postencephalitic symptoms during that period.

Dr. Campbell is a medical neurologist and a psychiatrist. He did not personally observe Dewey until shortly prior to his criminal trial, but reviewed the medical records pertaining to Dewey from 1972 and 1973. On the basis of that review, he concluded that Dewey, in 1972 and 1973, was acutely ill with viral encephalitis. According to Dr. Campbell, the symptoms of this disease include mental disturbances such as complete or transient loss of consciousness; somnolence; sleepiness; alternating periods of somnolence and wakefulness; confusion, disorientation, and emotional lability (a tendency to be emotionally unstable).

Dr. Campbell felt that Dewey's case of encephalitis was moderately severe, and that Dewey was beginning to recover in May of 1973 when Dr. Campbell first observed him. He doubted very much that Dewey formed any intent to evade taxes between July 1972 and May 1973 because during that time Dewey would have had a confused mental state and could not have calculated with any degree of accuracy. At that period of his life, in Dr. Campbell's opinion, Dewey was non compos mentis.

In Dr. Campbell's opinion, symptoms of encephalitis ebb and

flow in severity, and encephalitics sometimes achieve apparent recovery, sufficient for them to function in their former roles.

Dr. Campbell further opined that a person in Dewey's condition during 1972 and 1973 might be able to collect rent from rental properties. To make mortgage payments, in the doctor's opinion, Dewey would have required the help of his wife or attorney.

A probation officer who visited Dewey at San Francisco General Hospital between the 1973 criminal trial and July 18, 1973, reported to the judge that there did not appear to be any problem communicating with Dewey.

Both Doctors Kimbrough and Campbell testified at Dewey's criminal trial in 1973 that Dewey lacked the mental capacity to form a specific intent to sell narcotics. In spite of this testimony, a jury convicted Dewey of possessing narcotics and of possessing narcotics with the purpose of selling them. The conviction was affirmed by the Court of Appeals of California, First Appellate District.

For the taxable years 1969 through 1972, the Commissioner reconstructed petitioners' adjusted gross income. With the exceptions noted below, petitioners agree that the Commissioner's determinations are correct. The chart and footnotes on p. 631 set out the adjusted gross income (AGI) reported by petitioners, the AGI that they concede they received, and the AGI that respondent contends they received.

## OPINION

### Issue 1. Cost of Narcotics Seized in 1972

Petitioners contend that they expended only $21,000 for the powders containing heroin and cocaine which were confiscated from them in November 1972. The only evidence which they presented to support their contention was Dewey's uncorroborated testimony that $7,000 was paid for the heroin and $14,000 for the cocaine.

Respondent's agent, in determining what petitioners paid for the seized narcotics, consulted the laboratory report which reported the weight of the powder, San Francisco Police Department personnel, and the monthly Bureau of Narcotics publication which indicated the street prices of heroin and cocaine at varying degrees of purity. He then assigned a value of

| Taxable year | AGI reported by petitioner[s] | AGI petitioner[s][concede[s] should have been reported | AGI respondent claims should have been reported |
|---|---|---|---|
| | | DEWEY AND MARGARETTE M. WILSON | |
| 1972 | $10,886.13 | [1]$117,679.73 | $146,179.73 |
| | | MARGARETTE M. WILSON | |
| 1970 | 6,211.84 | 19,305.62 | 19,305.62 |
| 1971 | 0 | 20,812.83 | 20,812.83 |
| | | DEWEY WILSON | |
| 1969 | 0 | [2]11,937.25 | 11,937.25 |
| 1970 | 0 | [3]9,115.88 | 19,115.88 |
| 1971 | 3,418.44 | [4]18,885.68 | 23,885.68 |

[1] Petitioners claim that they paid only $21,000 for the narcotics seized in 1972, rather than the $65,013 determined by respondent. In arriving at this figure, respondent's agent consulted a monthly publication of the San Francisco Police Department's Bureau of Narcotics which purported to set out the street prices of various narcotic substances at various degrees of purity. He also consulted with San Francisco Police Department personnel. The laboratory analysis performed by the police did not, however, indicate the purity of the powder confiscated from petitioners. It only revealed whether the powders contained any heroin or cocaine.

[2] Dewey contends that he possessed a $20,000 cash hoard as of Jan. 1, 1969, of which respondent was unaware during the audit. However, he claims that $10,000 of this was spent in 1970, and a further $5,000 in 1971. Thus, even accepting the existence of the hoard, it would not change the net worth computation of 1969, as its value would be the same at Dec. 31 as at Jan. 1, 1969 ($20,000).

[3] Dewey claims he spent $10,000 of the alleged hoard as a downpayment on the Post Street lot, which was acquired in 1970.

[4] Dewey claims he spent $5,000 of the alleged hoard as a downpayment on the Fulton Street lot, acquired in 1971. The remaining $5,000 was not accounted for in Dewey's testimony.

$800 per ounce to the heroin-laden, and $1,200 per ounce to the cocaine-laden, powders. Petitioners do not contend, nor do we consider, that the agent's determination in this respect was "arbitrary and excessive." Thus, the burden of proof on this issue remains upon the taxpayer. *United States v. Janis*, 428 U.S. 433, 441–442 and n. 9 (1976); *Helvering v. Taylor*, 293 U.S. 507 (1935); *Welch v. Helvering*, 290 U.S. 111 (1933); *Avery v. Commissioner*, 574 F.2d 467, 468 (9th Cir. 1978); *Rockwell v. Commissioner*, 512 F.2d 882, 885 n. 1, 885–886 (9th Cir. 1975); *Jackson v. Commissioner*, 73 T.C. 394 (1979).

Dewey's bare assertions are insufficient to meet petitioners' burden of proof as to the amount expended for the narcotic-containing substances. However, we do note a discrepancy. The laboratory analysis found only 576 grams of heroin-laden powder in the items seized from petitioners, whereas the revenue agent used a figure of 601.75 grams in making his calculations. We have found, as a fact, that 576 grams is the correct figure and hence the adjustment to petitioners' 1972 gross income must be reduced accordingly.

## Issue 2. The $20,000 Cash Hoard

We find Dewey's claim that as of January 1, 1969, he had $20,000 in a safe-deposit box, of which respondent's agent was unaware, incredible for the following reasons.

First, Dewey testified that he spent $10,000 of the hoard in making a downpayment on the Post Street lot. This lot was acquired August 4, 1970, for a total purchase price of $19,716.80. As of December 31, 1970, the balance of the mortgage loan outstanding on the lot was $12,094.64. Thus, the downpayment could not have exceeded $7,622.16, the difference between these amounts.

Second, at trial, Dewey testified as well that the box was closed in 1968. This testimony is inconsistent with that discussed in the preceding paragraph. Finally, he admitted to respondent's agent that he had no cash on hand as of either December 31, 1968, or December 31, 1969.

We conclude that Dewey had no cash hoard in the safe-deposit box on January 1, 1969.

## Issue 3. The $7,500 Bail Bond

Dewey testified at trial that the $7,500 bail bond posted shortly after his arrest was paid by his nephew. He was unable to recall whether the nephew gave him the money or paid the bail bondsman directly. No evidence to corroborate this version of the facts was presented.

As discussed in the findings of fact, however, Dewey stated in a letter to the judge who was to preside at his criminal trial that he had spent all of his money on attorneys and bail bondsmen. Further, in his interview with respondent's agent, Dewey seemed to at least imply that he had spent $7,500 on bail, although the agent did not specifically inquire into the source of the funds.

Given the evidence before us, we cannot say that petitioners have met their burden of proof on this issue, and we must conclude that the bail money was paid from Dewey's own funds.

## Issue 4. Dewey's Fraud for 1971

Section 6653(b) provides:

(b) FRAUD.—If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.

The existence of fraud is a question of fact to be determined upon a consideration of the entire record. *Stratton v. Commissioner*, 54 T.C. 255, 282 (1970). Respondent has the burden of proving fraud and he must establish it for each taxable year involved by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. To establish fraud, respondent must show that the taxpayer acted with the specific intent to evade a tax believed to be owing. *Mitchell v. Commissioner*, 118 F.2d 308, 310 (5th Cir. 1941). Since direct evidence of fraudulent intent is seldom available, respondent may meet his burden of proof with circumstantial evidence. *Stone v. Commissioner*, 56 T.C. 213, 223–224 (1971).

Consistent and substantial understatement of income is evidence of fraud, as are inadequate or nonexistent records. *Lollis v. Commissioner*, 595 F.2d 1189, 1191–1192 (9th Cir. 1979);

*Stone v. Commissioner, supra* at 224. Conduct calculated to mislead or conceal is indicative of fraud. *Spies v. United States,* 317 U.S. 492, 498 (1943); *Gajewski v. Commissioner,* 67 T.C. 181, 200 (1976).

It is clear that many of these indicia of fraud are present in connection with Dewey's taxable year 1971 and, absent special circumstances, we would conclude that the respondent has met his burden of proving fraud on Dewey's part for such year. There are special circumstances, however. The evidence is overwhelming that for a significant portion of 1972, Dewey suffered from encephalitis which at times seriously impaired his normal mental function. During these times, we have no doubt that Dewey was incapable of forming the specific intent to evade tax which is an element of the fraud penalized by section 6653(b).

The filing of a return which understates tax liability, or the signing of such a return and its delivery to an agent who subsequently files it, are the specific acts in conjunction with which the intent discussed above must exist. "[L]iability [for fraud] arises * * * when the return is filed understating income with the intent to evade tax. * * * the fraudulent act is not committed until the return is filed." *Estate of Stein v. Commissioner,* 25 T.C. 940, 966–967 (1956), affd. per curiam 250 F.2d 798 (2d Cir. 1958). As was said by the court in *United States v. Rachmil,* 270 F. 869, 871 (S.D. N.Y. 1921):

> When * * * a step which has for its purpose nothing less than an attempt to defeat the Income Tax Law has taken place, namely, the filing of the return with the collector of internal revenue, the act denounced by the Income Tax Law itself has occurred. I say this because the return is then placed beyond the control of the defendant * * * . The attempt of the defendant, if the return be false and fraudulent, is complete.

Also *Conforte v. Commissioner,* 74 T.C. 1160, 1203 (1980); *Mitchell v. Commissioner,* 40 B.T.A. 424, 445 (1939), revd. on another issue 118 F.2d 308 (5th Cir. 1941); *Mitchell v. Commissioner,* 32 B.T.A. 1093, 1128, 1134, 1135 (1935), affd. in part and revd. in part 89 F.2d 873 (2d Cir. 1937), affd. 303 U.S. 391 (1938); *Hopkins v. Commissioner,* 19 B.T.A. 693, 696 (1930); *Arnold v. Commissioner,* 14 B.T.A. 954, 970, 974 (1928), appeal dismissed 38 F.2d 1011–1012 (8th Cir. 1929); *Collins v. Commissioner,* 7 B.T.A. 913, 915 (1927).

Dewey's return for 1971 was due to be filed on April 15, 1972.

Dewey fell from a ladder and struck his head on July 30, 1972. A copy of Dewey's return for 1971 was received in evidence. It bears no filing stamp.[3] It is apparently executed by Dewey, but the date he executed the return is not inserted. It is executed by George Tyrrell and the date he executed the return is February 17, 1972.

Because Dewey's mental condition after his fall in 1972 is in doubt, the filing date of the return is critical in deciding whether Dewey deliberately filed a fraudulent return for 1971. No doubt respondent had in his records the filing date of Dewey's 1971 return, but he failed to offer that proof.

Accordingly, we hold that respondent has failed to prove fraud with respect to Dewey's return for 1971 by the clear and convincing standard which is required. The addition to tax under section 6653(b) will not be applied to Dewey's 1971 taxable year.

### Issue 5. Dewey and Margarette's Fraud for 1972

For 1972, all of the previously mentioned indicia of fraud (substantial underreporting of income, lack of records) are present. In addition, a large amount of petitioners' assets were held by nominees. It is a fair inference that their purpose in doing so was to conceal assets from the respondent, since no other reason presents itself.

In determining whether respondent has met his burden of proof with respect to 1972, however, Dewey's medical condition must again be considered. In *Hollman v. Commissioner*, 38 T.C. 251 (1962), we held that although the taxpayer omitted substantial amounts of income which he derived from engaging in complex financial transactions, he was not guilty of fraud because, during the years in question, he was mentally ill, did not have normal contact with reality, and had a schizophrenic personality. He had been found incompetent by a Federal District Court to stand trial for tax evasion, and this Court had continued his civil case until a guardian ad litem could be appointed. The evidence as to the taxpayer's mental condition

---

[3]Respondent offered no evidence as to the practice of the District Director in stamping filing dates on returns timely filed. Sec. 6651(a)(1) imposes an addition to tax for late filing of an income tax return. The Commissioner has discretion in asserting the addition, however, if the delay in filing is due to reasonable cause. The Commissioner's failure to assert the addition does not, therefore, establish that the return was timely filed.

left us with such "troubling doubts" that we were unable to find that fraud had been shown by the requisite standard of proof. By contrast, in *Farber v. Commissioner*, 43 T.C. 407 (1965), where objective indicia of fraud were also abundant, we held that, based on all the evidence, the taxpayer's pituitary tumor did not cause him to lose touch with reality or to become mentally incompetent. During the years in controversy, he underwent "marked changes in personality" and suffered from fainting attacks, endocrine changes, vision defects, impotence, and loss of libido. However, he continued to manage his business competently and used sophisticated artifices to conceal income. 43 T.C. at 422–426.

The instant case lies somewhere between these extremes. We have no doubt that Dewey suffered from a viral encephalopathy, certainly during the fall of 1972 and perhaps during 1973. Contemporary physicians' records document the fact that at times Dewey was mentally confused, disoriented, and emotionally labile. Experts testified that from August 1972 to April 1973 Dewey was incapable of forming any intent to evade taxes.

Other evidence tends to point to a different conclusion, however. Dewey was hospitalized from August 21 to October 2, 1972; from November 5 to November 10, 1972; and from April 9 to April 13, 1973. Toward the end of each of these stays, records show that he had undergone significant improvement of his encephalitic syndrome. On September 26 and 27, 1972, Dewey was observed to be alert and to speak coherently. On November 8, 1972, he was "alert, oriented, [without] complaints, ready for discharge" only 3 days after admittance. On April 13, 1973, only 4 days after admittance, Dewey was "alert and responsive." His last two hospital stays were considerably shorter than the one from August 21 to October 2, 1972.

Most significantly, Dewey must have been found competent to stand trial for the narcotics charges in late 1972 or early 1973, the same time he had the encephalitic condition. His trial jury was presented with the same mental incapacity defense as we were, and, nevertheless, found Dewey guilty of possession with the intent to sell proscribed narcotics. While we do not hold that Dewey is thereby collaterally estopped from denying that he had the mental capacity to form an intent to evade tax, the guilty verdict is some evidence that Dewey was capable of forming such intent.

The respondent has proved that the petitioners' 1972 return was filed February 20, 1973.[4] Dewey was discharged from the hospital on November 10, 1972, and was not hospitalized again until March 6, 1973, when an electroencephalogram was performed on him the results of which were interpreted as normal. On the critical filing date of February 20, 1973, on the record before us, it appears that Dewey was not suffering from any significant mental impairment. We hold, therefore, that respondent has met his burden of proving fraud as to Dewey for the taxable year 1972.

Petitioners contend that the evidence is insufficient to sustain the fraud penalty with respect to Margarette for 1972. We disagree. The evidence clearly establishes that she was involved in the narcotics transactions. She was aware that petitioners' income was significantly higher than the amount reported on their returns, as shown by the credit application she signed. Margarette substantially understated her 1970 and 1971 income; she failed to even file a return for 1971. She was a successful, knowledgeable, businessperson. We are convinced that, at the time she signed the 1972 return, she knew it understated income. See *Conforte v. Commissioner*, 74 T.C. 1160, 1200–1203 (1980).

We conclude, therefore, that the petitioners' underpayment of tax for their taxable year 1972 resulted from the fraud of both.

Due to our resolution of issue 1,

*Decisions will be entered under Rule 155.*

---

[4]Respondent alleged in his answer in docket No. 7611–74 that Dewey filed the return at this time. Petitioners, in their reply, did not controvert this allegation which, under Rule 37(c), Tax Court Rules of Practice and Procedure, is deemed admitted.