PHILIP G. COLEMAN AND MAUREEN COLEMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CARDIOVASCULAR & THORACIC ASSOCIATES, LTD., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coleman v. Commissioner
Docket Nos. 6617-84; 6766-84; 19036-84.
United States Tax Court
T.C. Memo 1988-538; 1988 Tax Ct. Memo LEXIS 567; 56 T.C.M. (CCH) 710; T.C.M. (RIA) 88538; November 23, 1988. Rex A. Guest, Melvin L. Katten, Glenn A. Nadell and Richard L. Manning, for the petitioners. James F. Kidd, Andrew P. Fradkin, John J. Comeau, Virginia G. Schmid, Carleton E. Knechtel and Steedly Young, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to Tax
Docket No.
Petitioners
Year
Deficiency
section 6653(b) [1]
6617-84
Philip G. &
12/31/77
$  2,881.00
$  1,440.50
Maureen
12/31/78
18,441.00
9,220.50
Coleman
12/31/79
33,725.00
16,862.50
6766-74
Cardiovascular
9/30/77
5,783.00
2,891.00
& Thoracic
9/30/78
7,704.00
3,852.00
Assoc., Ltd.
9/30/79
24,053.00
12,026.00
9/30/80
6,350.00
3,175.00
19036-84
Philip G. &
12/31/80
4,422.00
2,211.00
Maureen Coleman
*570 The notices of deficiency raised a number of issues, some of which have been conceded. Respondent has conceded (1) all issues for the individual petitioners' 1977 year and the corporate petitioner's taxable year ending in 1977, (2) that the corporate petitioner is entitled to pension plan deductions for each of the years in issue, and (3) that petitioner Maureen Coleman is not liable for an addition to tax under section 6653(b) for the year 1978. The individual petitioners have conceded (1) the deficiencies for all years as set forth in the notices of deficiency, (2) that petitioner Philip Coleman is liable for the addition to tax under section 6653(b) for the years 1978 and 1979 and (3) that the statute of limitations has not run on their 1979 taxable year. The corporate petitioner has conceded (1) that its gross receipts were understated for all years as set forth in the notice of deficiency and (2) that the statute of limitations has not run on its taxable year ending in 1980. *571 The issues regarding individual petitioners remaining for decision are: (1) whether petitioner Philip Coleman is liable for an addition to tax under section 6653(b) for the year 1980, (2) whether petitioner Maureen Coleman is liable for an addition to tax under section 6653(b) for the years 1979 and 1980, (3) whether the statute of limitations has run on the individual petitioners' 1978 tax year, (4) whether petitioner Maureen Coleman is an innocent spouse within the meaning of section 6013(e) with respect to the income omitted from the joint individual return for the years 1978, 1979 and 1980, (5) whether the individual petitioners are entitled to deduct certain expenses relating to their ownership of a horse for the years 1978 and 1979, (6) whether the individual petitioners are entitled to the investment tax credit for certain expenditures on the horse in 1978 and (7) whether the horse donated to the American Cancer Society in 1980 was related to the activities of that charitable organization. The issues regarding corporate petitioner remaining for our decision are: (1) whether the taxable income of the corporate petitioner was understated for the tax years ending in 1978, 1979 *572 and 1980, (2) whether the corporate petitioner is liable for an addition to tax under section 6653(b) for the tax years ending in 1978, 1979 and 1980, and (3) whether the statute of limitations has run on the corporate petitioner's tax years ending in 1978 and 1979. FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petitions were filed, the individual petitioners were residents of Deerfield, Illinois, and the corporate petitioner was located in Chicago, Illinois. Petitioners Philip G. Coleman, M.D., (Philip) and Maureen Coleman, M.D., (Maureen) were married in November 1977. They remained married during the years in issue. Philip was a surgeon employed by Cardiovascular & Thoracic Associates, Ltd. (CTA), a medical corporation incorporated in Illinois. Philip was the incorporator of CTA, owned all of its stock, and was its sole director. He also was its sole officer, except that Maureen was designated vice president in December 1979. Maureen was a paid employee only in 1977, when she was paid $ 3,610 for doing research. She was not again involved *573 with CTA until December 1979, when she helped with the bookkeeping following the departure of CTA's secretary. Although she was a medical doctor, she did not perform any medical services for CTA. CTA had several bookkeepers during the years in issue. Theresa Aliaga (Aliaga) was the bookkeeper from February 1977 until late November 1979. Donna Bowers (Bowers) went to work in December 1979, and worked until February or March 1980. She was the office manager and did some bookkeeping. Bowers was replaced on a full-time basis in March 1980 by Mary Hunter (Hunter), who had started working part time in August or September 1979. Two different checking accounts play a role in this case. The first is the corporate account, checking account number XXXXX8901, which CTA maintained at the First National Bank of Lake Forest. Both Philip and Aliaga were signatories on this account from April 18, 1977 until December 18, 1979, when Aliaga was removed. On December 21, 1979, Maureen and Bowers were added as signatories. Following March 26, 1980, the signatories were Philip, Maureen and Hunter. The second checking account is the personal account, checking account number XXXXXX2106, which Philip *574 maintained at the First National Bank of Lake Forest. During the years in issue, Philip ordered that certain corporate receipts be deposited into the personal account rather than into the corporate account. The way in which this would occur was that the bookkeeper (Aliaga during most of the years in issue) would give Philip all of the checks received from the patients. Philip would endorse the checks and tell the bookkeeper which checks should be deposited into the corporate account and which into his personal account. All cash payments were deposited into his personal account rather than into the corporate account. During the time that Aliaga was bookkeeper, she recorded a patient's payment on that patient's ledger card. She also recorded the payment (with a few exceptions) on what could be termed the "receipts journal." This journal listed CTA receipts in chronological order. Aliaga kept these journals for the fiscal years ending September 30, 1978 and September 30, 1979. She also kept a receipts journal from October 1, 1979, until she left CTA in November 1979. During Aliaga's tenure she also kept what could be termed the "deposits journal." This journal had an "amount" *575 column and a "deposit" column. The "amount" column included a listing of all cash received. However, the column included only the checks deposited into the corporate account, while omitting the checks deposited into the personal account. The "deposit" column included the amount of each deposit into the corporate account. The sum of the entries in the "deposit" column fell short of those in the "amount" column by the amount of the undeposited cash. Maureen shared bookkeeping duties with Bowers and Hunter after Aliaga left in November 1979. Neither Bowers nor Maureen received any instructions on how to maintain the journals. Instead, they looked at the journals kept by Aliaga and attempted to make the same entries as she had. In this regard they were not entirely successful, as their entries in the receipts journal merely duplicated their entries in the deposits journal. Bowers and Maureen ceased maintaining the receipts journal after early January 1980. Maureen made the entries in the deposit journal (and in the receipts journal while it still was maintained) from December 3 until December 13, 1979, from December 18 until December 31, 1979 and from January 31 until February 18, 1980. *576 Maureen recorded checks when they were received. During the period between late October 1979 and May 1980, only three checks were omitted from the deposit journal. The only check that was omitted while Maureen was maintaining the journal was a $ 1,856 check from Blue Cross dated December 17, 1979. Starting in May 1980 and continuing until early August 1980, Hunter omitted over twenty checks from the deposit journal. All cash payments were omitted from both columns of the deposits journal during the time that Maureen was maintaining that journal. During this time, the receipts given to the patients who paid cash were signed by Bowers or by Hunter, never by Maureen. The joint individual returns were prepared by an Illinois certified public accountant, Daniel Deutsch (Deutsch). Deutsch was given only the deposit journals and did not know of the existence of the receipts journals. Deutsch calculated gross receipts for the corporate tax return by totalling the amounts listed in the "deposit" column of that year's deposit journal. He then reconciled that figure to the CTA bank statements. Due to the omission of receipts from the deposit journal, the corporate returns understated *577 CTA's gross income by $ 18,001 for the taxable year ending in 1978 and by $ 56,629 for the taxable year ending in 1979. The joint individual returns for 1978 and 1979 also omitted the diverted corporate funds, causing understatements on those returns of $ 29,469 and $ 50,044, respectively. In August 1980, a criminal investigation was commenced against Philip by the Justice Department. A plea agreement concerning charges against him under section 7206(1) was filed in that case on April 25, 1983. In the plea agreement, Philip admitted that as president of CTA he filed a materially false corporate tax return for the year ending in 1978 by omitting substantial corporate receipts from the return. He also admitted that he filed a materially false individual tax return for the calendar year 1979 by omitting substantial individual receipts which "constituted undeclared distributions of corporate receipts." Upon learning of the criminal investigation, Philip admitted his fraud to Maureen and told her to give Deutsch a list of the checks omitted from the deposits journal. Upon receiving this list, Deutsch requested and received a list of cash deposits to the personal account. After *578 receipt of these lists, Deutsch made an adjustment in the 1980 corporate books debiting "Due To/From Officer" and crediting "Income" by $ 23,150.68. The explanation for the adjustment was "To record checks and cash receipts during the year retained by officer, cash of $ 5,354.50, checks of $ 17,796.18." Deutsch also made an adjustment to the corporate books debiting "Officer's Salary" and crediting "Officer's Account" in the amount of $ 25,000. The explanation for this entry was "To record additional salary for officer." The lists of additional checks and cash given to the accountant were incomplete, leading CTA to understate its gross income by $ 10,163 for the year ending 1980. In addition, petitioners' joint individual return for 1980 omitted the diverted corporate funds, causing a $ 4,445 understatement of gross income. OPINION We will incorporate the remainder of the findings of fact into the opinion under headings that correspond to the various issues which must be determined. The burden of proof on all issues except fraud is upon petitioners. Section 7454(a); Rule 142(a); *579 Welch v. Helvering,290 U.S. 111 (1933). I. Individual Petitioners
Petitioners have conceded that the taxable income on the 1978, 1979 and 1980 joint individual returns was understated by $ 29,469, $ 50,044 and $ 4,445, respectively. Seven issues involving petitioners remain for decision. Philip -- section 6653(b)
Philip is liable for an addition to tax under section 6653(b) if respondent shows that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes. Rowlee v. Commissioner,80 T.C. 1111 (1983). Philip has conceded this addition to tax under section 6653(b) for the years 1978 and 1979. He has not conceded this issue for the year 1980. Until August 1980, when he learned of the criminal investigation, Philip was depositing substantial receipts into his personal account and was maintaining the books so that the joint and corporate returns would omit these receipts. Despite this, Philip argues that no fraud was involved in the filing of his 1980 return *580 because he made every effort to see that his 1980 return was accurate after he learned of the criminal investigation in August 1980. He attempted to ensure that his accountant received a listing of the funds paid into his personal account. Thus, he claims any understatement on the 1980 joint individual return was due to mistake and not to any fraudulent intent. Philip has conceded that he underpaid his taxes in 1980. His underpayment was due to his fraudulent behavior during the period before he learned of the criminal investigation. After learning of the investigation, he attempted to unwind and correct his nefarious scheme by giving his accountant lists of the omitted checks and (upon the accountant's request) the omitted cash. Both lists were incomplete, but the record does not support a finding that the incompleteness was due to fraudulent intention to evade tax rather than negligence or a mere inability to sort out the mess. We are not impressed by Philip's honesty and integrity, but Philip is an intelligent man who doubtless realized the futility of attempting to file a fraudulent return at a time when his earlier returns were being investigated for criminal fraud. In *581 this regard, Philip is liable for the addition to tax under section 6653(b) only if respondent can show that his fraudulent intent existed at the time he filed his return. This rule was set forth in Wilson v. Commissioner,76 T.C. 623 (1981), Supplemental Opinion 77 T.C. 324 (1981), which involved a taxpayer whose actions during his 1971 taxable year were fraudulent. Subsequent to that year he fell from a ladder, with resulting injuries of a nature which prevented him from forming a fraudulent intent to evade taxes. The issue in the case was whether the taxpayer had fallen from the ladder before or after he filed his return. If he had fallen from the ladder before he had filed his return, he would have had no fraudulent intent at the time the return was filed and, thus, would not have been liable for the addition to tax under section 6653(b). In the instant case, Philip's knowledge of the criminal investigation may be compared, in more ways than one, to a fall from a ladder. On the record before us, respondent has not shown that Philip had a fraudulent intent *582 to evade tax at the time that he filed his 1980 return. Thus, Philip is not liable for an addition to tax under section 6653(b) for 1980. Maureen -- section 6653(b)
In the case of a joint return, section 6653(b) (since renumbered with minor changes as section 6653(b)(3)) provides that the addition to tax for fraud shall not apply with respect to the tax of the spouse unless a portion of the underpayment is due to the spouse's fraud. Thus, Maureen is liable for the addition to tax under section 6653(b) only if respondent proves she had fraudulent intent to evade tax. Respondent has asserted such intent for the years 1979 and 1980 but not for 1978. Until December 1979, Maureen was not involved with the process of keeping the books, she did not deposit any funds into the corporate account, and there is no evidence her husband told her of his fraudulent activities. After Maureen started helping with the bookkeeping she accurately recorded all checks except one. Although she omitted cash receipts from the deposit journal, there is no evidence that she is the one who would be expected *583 to record such receipts since she was not the one who received the cash from the patients. Thus, respondent has failed to prove that Maureen is liable for the addition to tax under section 6653(b). Statute of limitations
The notice of deficiency pertaining to the 1978 and 1979 returns was mailed on December 20, 1983, more than 3 years after the timely filing of those returns. Philip has conceded his fraud for 1978 and 1979, and this concession normally would cause the statute of limitations to be extended under the provisions of section 6501(c)(1), which provides for an unlimited statute of limitations in the case of a false or fraudulent return filed with the intent to evade tax. However, petitioners claim that section 6501(c)(1) did not extend the statute of limitations for 1978 because respondent first alleged the applicability of section 6501(c)(1) to that year in his brief and not in his answer. Generally, this Court has refused to consider issues first raised in the briefs when surprise and prejudice are found to exist. Seligman v. Commissioner,84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986). Leaving aside the question *584 of whether section 6501(c)(1) should be considered a separate issue, in the instant case no surprise or prejudice existed. Respondent's answer raised the section 6501(c)(1) issue for both 1977 and 1979. That issue for 1977 and 1979 is essentially the same as for 1978. In addition, the answer did allege that Philip was liable for an addition to tax for 1978 under section 6653(b) and Philip has conceded this issue. The determination of whether fraud existed for purposes of that section would also determine whether the statute of limitations would be extended under section 6501(c)(1). Thus, petitioner had ample notice of the fraud issue for 1978, and was not surprised or prejudiced by the answer's omission of section 6501 for that year. Because the answer did raise the fraud issue for 1978, respondent satisfied the requirement of Rule 36(b). Accordingly, the section 6501(c)(1) issue was properly before the court for 1978, and the statute of limitations has not run on that year. Innocent Spouse
Maureen argues that under the innocent spouse provisions of section 6013(e) she should be relieved of liability for the understatements on the joint returns for the years 1978, 1979 *585 and 1980. [2]To obtain innocent spouse relief pursuant to section 6013(e), as amended by the Tax Reform Act of 1984, [3] Maureen must establish that (1) a joint return was made for the year in issue, (2) there was a substantial understatement of tax attributable to grossly erroneous items of Philip, (3) Maureen did not know, and had no reason to know, of the substantial understatement when she signed the return, and (4) taking into account all the facts and circumstances, it is inequitable to hold Maureen liable for the deficiency attributable to the substantial understatement. See section 6013(e); Purcell v. Commissioner,86 T.C. 228, 235 (1986), affd. 826 F-2d 470 (6th Cir. 1987). *586 The first requirement is satisfied for all years because joint returns were filed for those years. The second requirement also is satisfied for all years, because the items omitted from the gross income were attributable to Philip and the understatements exceeded $ 500 for all years. Section 6013(e)(2) and (3). In order to satisfy the third requirement, Maureen must establish both that she did not know that there was a substantial understatement when she signed the return and that she had no reason to know of the substantial understatement. We find no evidence that Maureen knew of the substantial understatements even when she was involved in the bookkeeping. She never maintained the deposit journal for more than a few weeks at a time, she listed all checks in the journal, and she was not involved with the receipt of cash. In order to show that she had no reason to know of the substantial understatement, Maureen must show that a reasonably prudent person in her circumstances would not have known of the substantial understatement. See Sanders v. United States,509 F.2d 162, 166-167 (5th Cir. 1975). *587 In determining whether a spouse had reason to know of a substantial understatement, courts typically consider three factors. Sanders v. United States, supra at 167. The first factor is Philip's refusal to be forthright about the couple's income. It is unclear whether this factor is satisfied because we do not know whether petitioners ever talked about financial matters. However, the record, including motions filed after trial, suggests that Philip was not totally honest and forthright with his wife. Both Philip and Maureen were witnesses in this case and were together in the courtroom throughout the trial. Their conduct and demeanor in the courtroom as observed by the trier of facts indicated that they were happily married. It was a surprise to the Court, and presumably to Maureen, to learn from post trial motions that Philip at the time of trial had already started divorce proceedings without her knowledge. The second factor is any unusual or lavish expenditures. During the years in issue, Philip gave Maureen three or four items of jewelry with values between $ 100 and $ 600. He also gave her a fur stole worth $ 800 and a fur coat worth $ 1,700. Philip *588 and Maureen took two vacations in Florida, one in California and two in the Caribbean. These vacations usually lasted 5 to 7 days. Philip also gave Maureen a car worth around $ 10,000. There were other expenditures, such as for a horse. Although petitioners lived well, none of their expenditures were unusual or lavish for their reported taxable income which was $ 104,511, $ 81,099 and $ 109,709 for 1978, 1979 and 1980, respectively. Thus, it is only the third factor, Maureen's participation in her husband's business affairs or the corporate bookkeeping, that could have given her reason to know of the understatement. Maureen testified that she did not understand the bookkeeping procedure that she was following but instead just tried to copy the format of the books from previous months. Her testimony on this issue is believable because rather than maintaining two different sets of books as Aliaga had done she maintained two identical sets. Although Maureen testified that she did not understand the bookkeeping procedure, we believe she felt she was accurately carrying out Aliaga's procedure. For this reason, and because she was maintaining the books for only short periods of times, *589 a reasonably prudent person in her situation would not have inquired about the correct bookkeeping procedure and would not have had any reason to know of the understatement. Thus, Maureen has satisfied the third requirement for innocent spouse relief. Finally, we conclude that, taking into account all the facts and circumstances, it is inequitable to hold Maureen liable for the deficiency attributable to the substantial understatement. Thus, we grant Maureen innocent spouse relief for all years. Schedule C deductions
On their 1978 and 1979 joint returns, petitioner deducted certain expenses relating to their ownership of a horse. The deductions taken by petitioners are allowable only if their horse activities were engaged in for profit. The question of whether an activity is engage in for profit is determined under sections 162 and 212(1) and (2). Section 1.183-1(a), Income Tax Regs.
As a child Philip bought dogs and sold them at a profit. He contends that he bought the horse for the same profit-making reason. He hired a trainer who was knowledgeable *590 in the training of show horses and who would ride the horse in various shows. On occasion Philip attempted to ride the horse, but contended that it was a very difficult horse to ride and that he did not feel confident riding it. Maureen never rode the horse because she was not a rider. This testimony does not establish a profit motive. The only factor which might provide evidence of a profit motive is the horse's appreciation in value from $ 12,000 to $ 18,000 during the time of petitioner's ownership. However, even this does not provide strong support because an increase in value does not necessarily imply that the horse was bought with the purpose of an increase in value. In addition, the horse was given away rather than sold for a profit, which suggests the absence of a profit motive. Petitioners have not carried their burden of proof as of the profit motive and their deductions are disallowed. Investment tax credit
Petitioners claim that they are entitled to the investment tax credit for an expenditure on saddles for the horse in 1978. This credit is allowable only if the horse activities were entered into for profit. They were not and, thus, the investment tax *591 credit is disallowed. Charitable deduction
Petitioners donated their horse to the American Cancer Society in 1980. Petitioners and respondent agree that at the time of the donation the horse had a basis of $ 10,000 (petitioners had taken $ 2,000 of depreciation) and a fair market value of $ 18,000. Petitioners took an $ 18,000 charitable deduction for the gift. Respondent allowed only a $ 13,600 deduction. The issue is whether there should be a reduction in the amount of the charitable deduction under section 170(e)(1)(B)(i) (petitioners have conceded another reduction under section 170(e)(1)(A)) because the use of the property by the American Cancer Society was unrelated to the purpose or function constituting the basis for the Society's exemption under section 501. A representative of the American Cancer Society told Maureen that the Society had access to a stable and that it would be willing to take the horse and use it for fund raising activities. Petitioner asserts that the use of the horse by the Society in fund raising activities was related to the Society's exempt purpose or function and that the section 170(e)(1)(B)(i) reduction should not occur. We need not *592 address this assertion because petitioner has presented no evidence that the horse was in fact used in the Society's fund raising activities. Thus, respondent correctly asserted the reductions, and petitioners are allowed a charitable deduction of only $ 13,600. Corporate Petitioner
Following are three issues involving the corporate petitioner: Income Tax
CTA concedes that it omitted $ 18,001, $ 56,629 and $ 10,163 from its gross income for the years ending in 1978, 1979 and 1980, respectively. Respondent accordingly alleges that petitioner understated its taxable income for those years. CTA claims that the diverted funds were compensation to Philip and that it is entitled to additional deductions under section 162(a)(1) equal to the amount of the diverted funds. Such deductions would exactly offset CTA's additional gross income. Respondent argues, however, that CTA should not be allowed a deduction because the diverted funds were a dividend to Philip. A distribution will be deductible to CTA under section 162(a)(1) only if, among other requirements, it is intended as compensation *593 for services. Section 1.162-7(a), Income Tax Regs.; Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). If CTA had intended the funds to be compensation, it could have reported them and claimed them as such on its returns. It did not do so. See Electric & Neon, Inc. v. Commissioner,56 T.C. 1324 (1971), affd. 496 F.2d 876 (5th Cir. 1974). In addition, Philip stated at trial that "my personal checkbook reflected more money at times than the salary that I was supposed to get from the corporation." Finally, in the plea agreement in his criminal case, Philip admitted that he filed a materially false individual tax return for the calendar year 1979 by omitting substantial individual receipts which "constituted undeclared distributions of corporate receipts." This language further indicates Philip's belief that the diverted funds were not compensation. We conclude CTA has not met its burden of proof that the diverted receipts were intended to be compensation. CTA may not deduct those diverted *594 receipts under section 162(a)(1). [4]
Section 6653(b)
Respondent alleges that petitioner is liable for the addition to tax under section 6653(b) for the years ending in 1978, 1979 and 1980. Petitioner claims that it cannot be subject to section 6653(b) because it had no intent to evade tax, since all net earnings were intended to be deductible compensation which would result in no net income and no tax. This is ex post facto tax planning and an ingenious attempt to "balance out" a fraudulent scheme. It does not fly. Philip's fraudulent intent to evade taxes for the years ending in 1978 and 1979 was all pervasive, and extended to the corporate taxes he evaded by his failure to report the diverted receipts on the corporate *595 return. His fraudulent intent is imputed to CTA. Auerbach Shoe Co. v. Commissioner,21 T.C. 191 (1953), affd. 216 F.2d 693 (1st Cir. 1954). Thus, CTA is liable under section 6653(b) for the years ending in 1978 and 1979. CTA is not liable for the year ending in 1980 because the return was filed after Philip learned of the criminal investigation. As noted above, respondent has not shown that Philip's fraudulent intent continued to exist after he learned of the criminal investigation. Statute of limitations
The notices of deficiency for 1978 and 1979 were not mailed within 3 years after the returns for those years were filed and petitioner alleges that the statute of limitations has run on those years. However, the corporation's fraudulent intent to evade tax during these years extended the statute of limitations under section 6501(c)(1). Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedures.↩
2. Petitioner Maureen on brief requested reconsideration of the Court's ruling at trial that the innocent spouse issue was properly before the Court. The argues that respondent's last minute answer to her amended petition regarding this issue and respondent's failure to mention this issue in the Trial Memorandum amounts to an admission of the allegations contained in the petition. We have reviewed the pleadings and reaffirm our ruling at trial that petitioner has been neither surprised nor prejudiced by respondent's actions, and thus the innocent spouse issue is properly before the court. ↩
3. Sec. 424(a), as amended by section 6013(e)↩, Tax Reform Act of 1984, 98 Stat. 801-802, applies retroactively to all years to which the Internal Revenue Code of 1954 applies.
4. The case of Slawek v. Commissioner,T.C. Memo. 1987-438, involved facts similar to those in the instant case. However, that case is distinguishable. First, in that case there was a corporate document which provided that the corporation's net income belonged to the doctor as compensation. There was no such document in the instant case. Second, in Slawek↩ the taxpayer did not state that the payments were not compensation.