ROBERT G. KRUEGER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krueger v. Commissioner
Docket No. 15566-82.
United States Tax Court
T.C. Memo 1987-37; 1987 Tax Ct. Memo LEXIS 37; 52 T.C.M. (CCH) 1429; T.C.M. (RIA) 87037; January 20, 1987. Robert G. Krueger, pro se. Stephen M. Friedberg, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: *40 Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Section 6653(b)
Year
Deficiency
Addition [1]
1978
$11,327.00
$5,663.50
1979
7,524.28
3,762.39
After concessions, [2] the issues for decision are: (1) Whether petitioner failed to report taxable income in the amounts determined by respondent; (2) Whether petitioner incurred deductible itemized expenses in an amount in excess of that conceded by respondent for each year; (3) Whether petitioner incurred any deductible traveling expenses while away from home in the pursuit of a trade or business within the meaning of section 162(a)(2); (4) Whether petitioner incurred deductible moving expenses within the meaning of section 217(a); and (5) Whether all or any part of the underpayment of tax each year was due to petitioner's fraud within the meaning of section 6653(b). *41 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Also, certain deemed admissions and the exhibits attached to the request for admissions are incorporated herein by this reference. [3]
Petitioner Robert G. Krueger resided in Vinton, Virginia at the time he filed his petition in this case. Petitioner was married to Joy Krueger at all times pertinent to this case. Mr. Krueger was the sole wage earner in the family during the taxable years 1978 and 1979, and Mrs. Krueger did not file any tax returns those years. Mr. and Mrs. Krueger had two dependent children those years. *42 Petitioner is an electrician and a member of the International Brotherhood of Electrical workers (AFL-CIO-CLC). Prior to 1978, petitioner obtained employment primarily through his local union located in Roanoke, Virginia and worked on construction jobs within the general vicinity of his home in Vinton, Virginia. [4] Geginning in 1978, securing employment in that area of the country became increasingly difficult, and petitioner began searching elsewhere for work. Around the end of January of 1978, petitioner left the Virginia area and traveled to Arizona in search of employment, putting his name on the various out-of-work lists he could find in that state. Petitioner secured employment and started work on February 13, 1978, with the Bechtel Power Corporation (hereinafter referred to as Bechtel) at a coal fired power plant under construction in St. Johns, Arizona. A power plant of *43 that type takes seven to eight years to construct. After working in St. Johns for several months, petitioner decided to move his family to Arizona. The traveling expenses claimed by petitioner are for the period before his family moved to Arizona. In late May or early June of 1978, petitioner returned to Vinton, Virginia and sold his house. The household furniture had been placed in a warehouse in Roanoke, Virginia at the end of April in anticipation of the sale and the family's departure for Arizona. Petitioner sold the house for $27,500 and the closing on the sale was held on June 9, 1978. Petitioner incurred closing costs on the sale in the amount of $3,653.90. [5]
*44 On or about June 6, 1978, petitioner and his family departed from Virginia and arrived in Arizona a couple of days later. The moving expenses claimed for 1978 relate to this move. On June 23, 1978, shortly after they arrived in Arizona, petitioner and his wife purchased a Transamerica 5th wheel trailer. He and his family lived in this trailer throughout the remainder of 1978 and for all of 1979. Petitioner worked for Bechtel in St. Johns, Arizona from February 13, 1978, to March 18, 1979, at which time he was laid off or fired from his job. Petitioner then moved his trailer and family to LaPlace, Louisiana where he began work at a refinery on April 1, 1979. It is unclear whether petitioner was fired or laid off by his employer in Louisiana, but in any event, the project was still going when he left. Petitioner then moved his trailer and family back to St. Johns and again began working for Bechtel at the power plant on July 2, 1979, where he worked throughout the rest of the year. [6]
*45 On his initial Form W-4, dated February 13, 1978, that he filled out when he first commenced working for Bechtel, petitioner claimed one exemption with respect to withholding allowances. Four days later he filed another Form W-4, claiming to be exempt from taxation. [7] Thereafter, and throughout the end of the taxable year 1979, petitioner filed the following Forms W-4 with Bechtel: Date
Marital Status
Allowances Claimed
4/24/78
Married
40 Allowances
5/18/78
Married
29 Allowances
7/13/78
Married
Exempt Status
9/19/78
Married
10 Allowances
9/27/78
Married
40 Allowances
7/03/79
Married
Exempt Status
Petitioner signed each of these Forms W-4 under the penalties of perjury. On the forms in which he claimed exempt status, petitioner certified that he incurred no liability for Federal income tax for the previous year and did *46 not anticipate incurring any liability for Federal income tax in the present year. Those statements were false, and petitioner knew they were false at the time he signed the forms. On the forms in which he claimed 10 to 40 withholding exemptions or allowances, he certified that the number claimed did not exceed the number to which he was entitled. Those statements were false, and petitioner knew they were false at the time he signed the forms. On three different occasions, Bechtel warned petitioner about filing improper W-4's. In response to petitioner's Form W-4 dated April 24, 1978, on which he claimed 40 withholding allowances, Bechtel advised petitioner by letter dated May 2, 1978, of potential civil and criminal penalties for filing an improper Form W-4. Bechtel requested petitioner to either furnish support for the exemptions claimed or to file a revised Form W-4 disclosing the proper number of exemptions to which he was entitled. Bechtel issued to petitioner essentially identical letters dated May 22, 1978, and October 18, 1978, in response to petitioner's Forms W-4 dated May 18, 1978, and September 27, 1978, respectively. Petitioner never filed a corrected Form W-4. *47 [8] As a result of the false Forms W-4 that petitioner filed with Bechtel during the years in issue, only $1,219.22 of Federal income tax was withheld by Bechtel during 1978 and no Federal income tax was withheld by Bechtel during 1979. For the taxable years 1969 through 1977, petitioner had filed proper Federal income tax returns (Forms 1040), reporting his wage income and claiming various deductions and exemptions in each of those years. Petitioner usually received a refund of a few hundred *48 dollars each year. For the taxable year 1978, petitioner submitted a Form 1040 to the Internal Revenue Service containing his name, address, and social security number. On this Form 1040, petitioner checked the filing status of married filing separately and claimed a total of four personal and dependency exemptions.This form was signed and dated, but contained no information with respect to petitioner's income and deductions. Instead of reporting his income and deductions, petitioner inserted the phrase "object: self incrimination" or the word "none" on lines 8 to 66 of the form. [9] Petitioner submitted a similar Form 1040 to the Internal Revenue Service for the taxable year 1979. At the time he prepared the Forms 1040 for 1978 and 1979, petitioner was neither the target of a grand jury investigation nor subject to any other criminal investigation into his affairs, eigher *49 tax or otherwise. At that time petitioner had no reason to believe that there was any criminal investigation or possible criminal charge involving him. The Internal Revenue Service returned both of petitioner's Forms 1040 to him, informing him that they were not proper tax returns. The Internal Revenue Service wrote to petitioner, advising him as follows: The U.S. Individual Income Tax Return form we received from you for the above year is not acceptable as an income tax return because it does not contain information required by law, and it does not comply with Internal Revenue Code requirements. This is your notice of the legal requirements for filing Federal individual income tax returns. Failure to file a required return may subject you to prosecution under Internal Revenue Code section 7203. The requirements, and an explanation of the penalty, are shown on the back of this letter. We have enclosed two blank income tax return forms and an addressed envelope for your convenience in filing a proper return. Petitioner never filed proper tax returns for the taxable years 1978 and 1979. During the taxable year 1978, petitioner received wages from *50 Bechtel in the amount of $31,999.28. During the taxable year 1979, petitioner received wages from Bechtel in the amount of $24,075. These wages were properly reported by Bechtel on the wage and tax statements (Forms W-2) issued to petitioner for each of the years. Petitioner also received wages in 1979 from the Lambert Electric Company totaling $4,934, and from the W.E. Mason Corporation totaling $268. The record contains no information as to the nature of this employment or where the jobs were located. After the essentially blank Forms 1040 had been filed by petitioner, the Internal Revenue Service, by letter dated May 27, 1980, advised him that a criminal investigation had commenced regarding his tax liability for the taxable years 1977, 1978, and 1979. Thereafter, by letter dated February 3, 1981, the Internal Revenue Service informed petitioner that his Federal tax liability for the taxable years 1977, 1978, and 1979 was no longer subject to an investigation by the Criminal Investigation Division. However, petitioner was informed that the matter regarding his 1978 and 1979 taxable years was in the Examination Division for further consideration. By statutory notice of *51 deficiency dated April 13, 1982, respondent determined that petitioner failed to report his wage income for the taxable years 1978 and 1979 in the amounts of $31,999.28 and $29,277.10, respectively. Respondent also determined that in 1978, petitioner failed to report taxable gain in the amount of $3,200 from the sale of his house in Virginia. [10] Finally, respondent determined that all or part of the resulting underpayment of tax for the taxable years 1978 and 1979 was due to fraud, and therefore determined an addition to tax under section 6653(b). [11]
*52 ULTIMATE FINDINGS OF FACT 1. Petitioner failed to report his taxable income in each of the years in issue resulting in underpayments of tax in both years. 2. Petitioner filed false Forms W-4 with the intent to evade tax. 3. All or part of the underpayment of tax in each of the years in issue was due to petitioner's fraud. OPINION After filing proper tax returns from 1969 through 1977, petitioner in 1978 embarked upon a course of tax folly. That year he began filing false W-4's with his employer to stop the withholding of Federal tax from his wages and later began filing essentially blank, Porth-type Forms 1040 in which he gave no information as to his income and deductions and instead asserted frivolous Fifth Amendment claims. United States v. Daly,481 F.2d 28 (8th Cir. 1973); United States v. Porth,426 F.2d 519 (10th Cir. 1970); Jarvis v. Commissioner,78 T.C. 646 (1982). Petitioner embarked upon this course of conduct within a few days after commencing work with the Bechtel Power Corporation at a power plant construction project in Arizona, where petitioner unwisely started taking his tax and legal advice from *53 his co-workers. Despite warnings from his employer and later from the Internal Revenue Service, petitioner persisted in his folly. Dispite the tax protester overtones in this case, at trial petitioner wisely but belatedly tried to address at least some of the substantive tax issues involved in his case. It is regrettable this did not occur earlier because the Court believes that with proper development of the facts of his case petitioner could have further reduced his tax liability. However, the Court must decide the case on the fragmentary evidence and inadequate record presented. Respondent's adjustments to income in the statutory notice of deficiency consist entirely of petitioner's unreported wage income each year and the unreported capital gain in 1978 from the sale of petitioner's house in Virginia. Petitioner does not, and cannot, dispute the correctness of the amounts of unreported wage income determined by respondent. Indeed, these amounts have been conclusively established for purposes of this case by the deemed admissions and documentary evidence. *54 Freedson v. Commissioner,65 T.C. 333, 335 (1975), affd. 565 F.2d 954 (5th Cir. 1978); Rule 90(f) (formerly Rule 90(e)). As to the unreported capital gain on the sale of the house, there is no real dispute (n. 10, supra), and one issue that might have aided petitioner was never raised. [12]
In his petition, at trial, and on brief, petitioner has consistently taken the position that respondent's deficiency determinations are incorrect since respondent failed to take into account any deductions (other than the four personal and dependency exemptions) in computing petitioner's income tax liability for each of the years in issue. Of course petitioner did not claim any deductions on the Porth-type Forms 1040 he filed. At trial, petitioner claimed he was entitled to deduct moving expenses, *55 traveling expenses incurred while away from home, and various itemized deductions. Petitioner presented some receipts and documents at trial to try to substantiate several of these items. Excess Itemized Deductions
Respondent concedes on brief that petitioner has substantiated and may properly claim the following as itemized deductions for the taxable year 1978: Deduction
Amount
Interest
$1,590.20
Taxes
197.88
Union Dues
520.76
Total
[13] $2,308.84
In addition, respondent concedes that petitioner has substantiated and may properly claim itemized deductions for the taxable year 1979 totaling $745.04 consisting of taxes, interest, and union dues. However, these expenses do not exceed the zero bracket amount for that year ($1,600) and thus, are not deductible. Petitioner argues he is entitled to itemized deductions in the amount of $3,442 for the taxable year 1978. However, after carefully reviewing all the evidence, we are satisfied that petitioner has failed *56 to prove his entitlement to itemized deductions in any amount in excess of the amount conceded by respondent. Deputy v. DuPont,308 U.S. 488 (1940); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934). Traveling (Away from Home) Expenses
Petitioner claims he incurred expenses for lodging, meals, and traveling totaling $3,049.65 that are properly deductible under section 162(a)(2). Petitioner argues that he worked in St. Johns, Arizona while maintaining his residence in Virginia for his wife and children. Petitioner claims these expenses for the period from January of 1978 through June 6, 1978, when, he says, he was away from home in the pursuit of a trade or business. Generally, section 262 disallows any deduction for personal, living, or family expenses. Section 162(a)(2), however, allows a taxpayer to deduct expenses for meals, lodging, and transportation incurred while away from home in the pursuit of a trade or business. The traveling expenses are deductible only if they are: (1) reasonable and necessary; (2) incurred while "away from home"; and (3) incurred in the pursuit of a trade or business. *57 Commissioner v. Flowers,326 U.S. 465 (1946), rehearing denied 326 U.S. 812 (1946). The word "home" as used in section 162(a)(2) means the general vicinity of the taxpayer's principal place of business or employment rather than the location of his personal residence, if the two are not the same. Mitchell v. Commissioner,74 T.C. 578, 581 (1980); Daly v. Commissioner,72 T.C. 190, 195 (1979), revd. 631 F.2d 351 (4th Cir. 1980), affd. on rehearing 662 F.2d 253 (4th Cir. 1981); Kroll v. Commissioner,49 T.C. 557, 561-562 (1968). There is an exception to this general rule, however, where a taxpayer accepts an assignment for temporary as opposed to indefinite or permanent employment away from his residence and usual place of employment. In that event, the site of his temporary employment is not the taxpayer's home for purposes of section 162(a)(2), and he may deduct certain expenses incurred with respect to his temporary place of employment that would otherwise be nondeductible personal expenses. *58 Peurifoy v. Commissioner,358 U.S. 59 (1958), rehearing denied 358 U.S. 913 (1958); Babeaux v. Commissioner,601 F.2d 730 (4th Cir. 1979), cert. denied 445 U.S. 943 (1980). However, when termination of employment cannot be expected or foreseen within a fixed or reasonably short period of time, the taxpayer's tax home shifts to such place of employment so that he cannot satisfy the "away from home" requirement. Verner v. Commissioner,39 T.C. 749 (1963). Whether petitioner's employment in St. Johns, Arizona was "temporary or indefinite" is a question of fact. Peurifoy v. Commissioner,358 U.S. 59 (1958). We are satisfied from the record that petitioner's employment during the period in question was indefinite rather than temporary and therefore petitioner was not away from home within the meaning of section 162(a)(2). Temporary employment has been held to be the type of employment that can be expected at the time of its acceptance to last only for a short period of time. Stated another way, "to qualify for a deduction under the temporary-indefinite rule, the employment must be tempoary *59 in contemplation at the time of its acceptance and not indeterminate in fact as it develops." McCallister v. Commissioner,70 T.C. 505, 509 (1978). Moreover, as we stated in Norwood v. Commissioner,66 T.C. 467, 469-470 (1967): Even if it is known that a particular job may or will terminate at some future date, that job is not temporary if it is expected to last for a substantial or indefinite period of time. Ford v. Commissioner,227 F.2d 297 (4th Cir. 1955, affg. T.C. Memo. 1954-209; Lloyd G. Jones,54 T.C. 734 (1970), affd. 444 F.2d 508 (5th Cir. 1971); Leo C. Cockrell,38 T.C. 470 (1962), affd. 321 F.2d 504 (8th Cir. 1963). * * * Petitioner argues, somewhat confusingly, that his job with Bechtel had "the outlook of many years of work" but was for an indefinite term of employment. Petitioner is apparently referring to the degree of impermanence in his job that is inherent in the entire construction industry. Indeed a construction worker essentially begins to work himself out of a job on the day he begins working. However, petitioner mistakenly equates *60 such impermanent or indefinite employment with tempoary employment. The proper formulation is temporary versus indefinite [or impermanent]. The Court of Appeals for the Fourth Circuit, to which any appeal in this case would lie, has recognized that work in the heavy construction industry, by its very nature, is to a degree both transient and impermanent. Commissioner v. Peurifoy,254 F.2d 483, 486 (4th Cir. 1957), affd. per curiam 358 U.S. 59 (1958). The Fourth Circuit in Peurifoy also pointed out that employment in the construction industry is usually on a job by job basis and lasts no longer than the need for the particular skill of the individual employee. However, these inherent traits of the construction industry do not relieve the taxpayer of his burden of showing that his employment was temporary as opposed to indefinite. Commissioner v. Peurifoy,supra,254 F.2d at 487. In February of 1978, petitioner secured employment with Bechtel at a coal fired power plant under construction in St. Johns, Arizona. Petitioner worked at the power plant for several months before he moved his family to Arizona. He wanted to make *61 sure the job warranted moving his family. We are satisfied that petitioner's subjective concerns related to the impermanence of the job, an inherent trait of the heavy construction industry, rather than to the temporariness of his job. According to petitioner, construction projects such as the one in St. Johns usually lasted seven to eight years. There is nothing in the record indicating the stage of construction at the time his employment began in 1978, but petitioner has failed to prove that such employment was temporary rather than indefinite. Apparently the project was still going on when petitioner returned to the project in 1979 after working on another job in Louisiana and/or California. Indeed, except for approximately three months in Louisiana and/or California during 1979, petitioner was employed at the power plant in St. Johns, Arizona, from February of 1978 through the end of 1979. Based on the entire record, we conclude that petitioner's job in St. Johns, Arizona, was indefinite rather than temporary. Accordingly, petitioner's tax home was Arizona in 1978, and he was not "away from home" within the meaning of section 162(a)(2) during the period in question. Petitioner *62 is not entitled to deductions claimed. [14]
In claiming "away from home" expense under section 162(a)(2), petitioner did not focus upon those portions of his claimed expenditures that might otherwise be allowable as job hunting expenses. Cremona v. Commissioner,58 T.C. 219 (1972); Primuth v. Commissioner,54 T.C. 374 (1970). Thus, while not clearly formulated by petitioner in so many words, the record shows expenditures for a round-trip to Arizona and return and lodging before securing the Bechtel job. Accordingly we allow petitioner $643.62 for travel from Virginia to Arizona and return (1,893 miles at $ .17 per mile X 2 = $643.62) and lodging of $26.78. See Rev. Proc. 77-40, 1977-2 C.B. 574. This amounts to an additional employee business expense of $670.40 to which he is entitled. *63 Moving Expenses
Petitioner claims he incurred moving expenses in 1978 and twice in 1979 that are properly deductible under section 217. Specifically, petitioner claims moving expenses from Vinton, Virginia to St. Johns, Arizona for the taxable year 1978 and moving expenses from LaPlace, Louisiana, to Santa Cruz, California and again from Santa Cruz, California to St. Johns, Arizona, for the taxable year 1979. Deductions are a matter of legislative grace and petitioner must satisfy the specific statutory requirements for the deductions he claims. Deputy v. DuPont,supra;New Colonial Ice Co. v. Helvering,supra.We think petitioner has satisfied the statutory requirements of section 217 for his initial move from Virginia to Arizona in 1978 and is entitled to deduct moving expenses specifically allowed by section 217. Respondent's sole contention with respect to petitioner's claimed moving expenses is that petitioner has failed to establish he satisfied the 39-week test as provided under section 217(c)(2)(A) or has failed to prove the applicability of any of the exceptions to this 39-week test as provided by section 217(d)(1). *64 Section 217 provides in part: SEC. 217. MOVING EXPENSES. (a) Deduction Allowed. -- There shall be allowed as a deduction moving expenses paid or incurred during the taxable year in connection with the commencement of work by the taxpayer as an employee or as a self-employed individual at a new principal place of work. * * * (c) Conditions for Allowance. -- No deduction shall be allowed under this section unless -- * * * (2) * * * (A) during the 12-month period immediately following his arrival in the general location of his new principal place of work, the taxpayer is a full-time employee, in such general location, during at least 39 weeks, * * *. * * * (d) Rules for Application of Subsection (c)(2). -- (1) The condition of subsection (c)(2) shall not apply if the taxpayer is unable to satisfy such condition by reason of -- (A) death or disability, or (B) involuntary separation (other than for willful misconduct) from the service of, or transfer for the benefit of, an employer after obtaining full-time employment in which the taxpayer could reasonably have been expected to satisfy such condition. The 12-month period and 39-week test set forth in section *65 217(c)(2)(A) are measured from the date of the taxpayer's arrival in the general location of the new principal place of work. Generally, date of arrival is the date of the termination of the last trip preceding the taxpayer's commencement of work on a regular basis and is not the date the taxpayer's family or household goods and effects arrive. Sec. 1.217-2(c)(4)(ii), Income Tax Regs. Petitioner arrived in Arizona around the end of January of 1978 and commenced work for Bechtel in St. Johns, Arizona on February 13, 1978. Contained in the record are copies of the weekly payroll checks that Bechtel issued to petitioner during the taxable years 1978 and 1979. Each check was issued from Bechtel's payroll account for job number 10507, obviously a reference to the construction project in St. Johns, Arizona. From February 1, 1978, through January 31, 1979, Bechtel issued a total of forty five weekly payroll checks to petitioner. There is nothing in the record indicating that petitioner was not a full-time employee of Bechtel during at least 39, if not all, of these 45 weeks during this 12-month period. Respondent does not seriously suggest otherwise. Accordingly, petitioner satisfied *66 the 39-week requirement and is entitled to deduct his moving expenses incurred in moving from Virginia to Arizona to the extent allowed under section 217. However, with respect to the moving expenses petitioner claims for the two moves in 1979, petitioner clearly did not satisfy the 39-week requirement pursuant to section 217(c)(2)(A) and has failed to prove any exception to this requirement as provided in section 217(d) with respect to either move. Petitioner relies upon the exception for involuntary separation, but section 217(d)(1)(B) expressly requires that the involuntary separation be "from the service * * * of an employer after attaining full-time employment in which the taxpayer could reasonably have been expected to satisfy such condition [39-week requirement]." Petitioner failed to provide the necessary information in regard to any employment in Louisiana and/or California in 1979. [15] Therefore, petitioner is not entitled to a deduction for moving expenses under section 217(a) in 1979. *67 Having now concluded that petitioner is entitled to moving expenses for the first move to Arizona in 1978, we must also determine the amount allowable.Petitioner claims he incurred moving expenses in 1978 totaling $4,740.84. Specifically, petitioner claims $226.04 for travel, lodging, and meals under section 217(b)(1)(B); $861.80 for meals and lodging under section 217(b)(1)(D); and $3,653 in settlement expenses on the sale of his house under section 217(b)(1)(E). Section 217(b) provides: (b) Definition of Moving Expenses. -- (1) In General. -- For purposes of this section, the term "moving expenses" means only the reasonable expenses -- (A) of moving household goods and personal effects from the former residence to the new residence, (B) of traveling (including meals and lodging) from the former residence to the new residence, (C) of traveling (including meals and lodging), after obtaining employment, from the former residence to the general location of the new principal place of work and return, for the principal purpose of searching for a new residence, (D) of meals and lodging while occupying temporary quarters in the general location of the new principal place *68 of work during any period of 30 consecutive days after obtaining employment, or (E) constituting qualified residence sale, purchase, or lease expenses. Some of the expenses listed in section 217(b) and otherwise allowable are subject to certain limitations. The expenses incurred under subparagraphs (A) and (B) of section 217(b) are subject only to a reasonableness standard. However, reasonable expenses incurred under subparagraphs (C), (D), and (E) of such section are subject to an overall dollar limitation of $3,000, of which no more than $1,500 can be attributable to expenses under subparagraphs (C) and (D). Sec. 217(b)(3)(A) and (B). [16] Accordingly, we conclude that petitioner is entitled to deduct them amount of $3,226.04 of moving expenses he incurred in 1978 as explained below. *69 Petitioner claims a total of $226.04 for travel, lodging, and meal expenses under section 217(b)(1)(B), specifically, $132.51 for traveling, $43.53 for lodging, and $50 for meals. Petitioner computed his traveling expense based on total mileage of 1,893, using the then applicable standard mileage rate of seven cents per mile. See Rev. Proc. 74-25, 1974-2 C.B. 478. In addition, petitioner presented receipts to substantiate his lodging expenses. Moreover, although petitioner did not document his meal expense of $50, we are satisfied that petitioner incurred at least this amount to feed a family of four on the two-day drive from Virginia to Arizona. Accordingly, petitioner incurred expenses of $226.04 for travel, lodging, and meals within the meaning of section 217(b)(1)(B). Petitioner claims $861.80 under section 217(b)(1)(D) for meals and lodging while occupying temporary quarters. Specifically, petitioner claims meal and lodging expenses in the amounts of $750 and $111.80, respectively. Petitioner substantiated his lodging expenses with receipts but failed to present any documentation with respect to his meal expenses. Howver, *70 when a taxpayer proves that some part of an expenditure was made for deductible purposes and when the record contains sufficient evidence for us to make some reasonable approximation, we will do so. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Although the evidence is less than satisfactory for this purpose, we will do our best with the materials at hand, "bearing heavily * * * upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner,supra,39 F.2d at 544. Based on all the facts and circumstances, but bearing heavily against petitioner for the inexactitude of his evidence, we conclude that petitioner is entitled to deduct the amount of $200 for meal expenses while occupying temporary quarters. [17] Accordingly, petitioner incurred total expenses of $311.80 for meals and lodging within the meaning of section 217(b)(1)(D). *71 Petitioner claims qualified residence sale expenses in the amount of $3,653 under section 217(b)(1)(E). This amount is not disputed by respondent, but the precise figure is $3,653.90. However, due to the dollar limitations pursuant to section 217(b)(3)(A), petitioner is entitled to deduct only $2,688.20 ($3,000 less $311.80) of his qualified residence sale expenses under section 217. However, the remaining $965.70 of qualified residence sale expenses will be used to recompute petitioner's gain on the sale in the parties' Rule 155 computation. [18] See nn. 2, 5, 10, supra.
*72 Fraud Addition
The final issue for decision is whether petitioner is liable for the section 6653(b) fraud addition. [19] Respondent bears the burdan of establishing fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, *73 and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981), Supplemental Opinion 77 T.C. 324 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), cert. denied *74 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Otsuki v. Commissioner,supra,53 T.C. at 105-106. Specifically, we must consider the taxpayer's conduct and other circumstances surrounding the preparation, signing, and filing of the alleged fraudulent return. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968). See also Wilson v. Commissioner,supra,76 T.C. at 634. The two elements of fraud are an underpayment of tax each year and that some part of the underpayment is due to fraud. *75 Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972); Stone v. Commissioner,56 T.C. 213, 220 (1971). The record clearly indicates that petitioner received substantial wage income in each of the years that he failed to report, resulting in an underpayment of tax in each year. Although petitioner has established entitlement to certain deductions, there are still underpayments of tax for each year. We must now determine whether the underpayment of tax for each year was due to fraud. We are satisfied from the record as a whole that respondent has established by clear and convincing evidence that all or part of petitioner's underpayment of tax for each of the years in issue was due to fraud. During these years, petitioner earned substantial wages from his employer, Bechtel, which he failed to report. After years of filing proper tax returns, petitioner suddenly filed essentially blank, Porth-type returns. We are satisfied that petitioner was well aware of his obligation to report his W-2 wage income and to pay taxes on this income. For the taxable years 1969 through 1977, petitioner had filed proper Federal income tax returns on which *76 he reported income and paid tax on this income for those years. The Forms 1040 petitioner submitted to the Internal Revenue Service for the taxable years 1978 and 1979 did not represent an honest and reasonable attempt to satisfy the requirements of the tax law and contained no financial information from which respondent could compute and assess petitioner's tax liability for those years. See Beard v. Commissioner,82 T.C. 766, 777 (1984), affd. 793 F.2d 139 (6th Cir. 1986). Those forms did not constitute returns within the meaning of section 6011 and the regulations thereunder. See Reiff v. Commissioner,77 T.C. 1169 (1981). Failure to file a return can be persuasive evidence of an intent to defraud the government. Stoltzfus v. United States,supra,398 F.2d at 1002; Habersham-Bey v. Commissioner,78 T.C. 304 (1982). Petitioner claims that he was attempting to invoke his Fifth Amendment privilege against self-incrimination, arguing that he objected to specific questions on his Forms 1040 due to the threat of self-incrimination. We think petitioner's Fifth Amendment claim is frivolous. Petitioner *77 was not the target of a grand jury investigation and was not aware of any criminal investigation, either tax or otherwise, into his affairs at the time he prepared and filed his Forms 1040 for 1978 and 1979. Petitioner has failed to present one single fact that would suggest he had any basis, let alone any reasonable basis, for his Fifth Amendment claim. [20]The Fifth Amendment privilege applies only where there is real and appreciable danger of self-incrimination and reasonable cause to apprehend such danger, not just a remote, speculative possibility.Petitioner's purported fears were sheer speculation, which the Court would characterize as mere flights of fancy. The Fifth Amendment privilege may not, contrary to what petitioner may have believed, be used to evade payment of lawful taxes. Steinbrecher v. Commissioner,712 F.2d 195, 198 (5th Cir. 1983), affg. a Memorandum Opinion of this Court; Edwards v. Commissioner,680 F.2d 1268, 1271 (9th Cir. 1982), affg. per curiam an unreported decision of this Court. The Court is satisfied that petitioner's Fifth Amendment claim was wholly frivolous at the time he prepared and filed his Forms 1040, and *78 that petitioner knew it was. [21]
*79 Furthermore, petitioner took affirmative steps to avoid paying taxes through employer withholding. During the years in issue, petitioner filed numerous false Forms W-4 with his employer on which he claimed 10 to 40 withholding allowances and at times claimed tax-exempt status. Petitioner signed each of these Forms W-4 under the penalties of perjury. At the time petitioner submitted each of his Forms W-4 to his employer, petitioner knew he was not exempt from tax or entitled to claim the excessive withholding allowances he reported. We are satisfied that petitioner submitted these false Forms W-4 in order to stop altogether the withholding of Federal income taxes from his wages and with the intent to evade payment of his taxes. These false Forms W-4 to eliminate withholding is indicative of an intent to evade the payment of income taxes. Hebrank v. Commissioner,81 T.C. 640, 642-644 (1983); Habersham-Bey v. Commissioner,78 T.C. 304 (1982). Petitioner argues that in claiming excessive withholdings and in some instances claiming to be tax exempt, he was not attempting to avoid paying Federal income tax. Petitioner says that for the taxable years *80 1969 through 1977, he overpaid his tax liability in each of those years by employer withholdings and was entitled to refunds. Petitioner claims that it was his understanding if a person received a refund in any given year, he did not have a tax liability for that year. Petitioner struck the Court as an intelligent person, who could not possibly believe any such thing. He further contends that the Forms W-4 he submitted to his employer during the years in issue were an attempt to adjust the amount of withholding to make certain neither an underpayment nor an overpayment of tax occurred in any year. If that were really what petitioner was trying to accomplish, he would have prepared proper tax returns to see if he had in fact been overwithheld or underwithheld. In the total context of this case, petitioner's explanation is wholly unworthy of belief. On three occasions petitioner was warned by his employer about filing improper Forms W-4. After he filed his Porth-type returns, the Internal Revenue Service twice warned him that his Forms 1040 were not proper returns.When coupled with petitioner's failure to heed these five warnings, petitioner's false W-4's and Porth-type *81 returns constitute strong evidence of fraud. Goodmon v. Commissioner,761 F.2d 1522, 1524 (11th Cir. 1985); Hebrank v. Commissioner,supra;Habersham-Bey v. Commissioner,supra.
Petitioner's fraud has been shown by clear and convincing evidence for each of the years in issue and we are satisfied that the section 6653(b) fraud addition is fully justified in this case. To reflect the concessions and our holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. In the statutory notice of deficiency, respondent determined that petitioner failed to report long-term capital gain in the amount of $3,200 from the sale of his residence in 1978. At trial petitioner conceded that the gain from that sale is taxable to him, and respondent conceded that the amount of the gain should be reduced to the extent of certain allowable sales expenses. Petitioner filed essentially blank Porth-type (Fifth Amendment) returns. United States v. Porth,426 F.2d 519, 522-523 (10th Cir. 1970); Jarvis v. Commissioner,78 T.C. 646, 653-654↩ (1982). Although petitioner claimed no itemized deductions on the Forms 1040 he filed, respondent conceded at trial and on brief that petitioner is entitled to certain deductible expenses to the extent such substantiated amounts exceed the zero bracket amount each year.
3. Respondent having served on petitioner a request for admissions, with attached exhibits, and petitioner having failed to respond to this request, the requested admissions were deemed admitted and are conclusively established for purposes of the instant case. Morrison v. Commissioner,81 T.C. 644, 646-650 (1983); Freedson v. Commissioner,65 T.C. 333, 335 (1975), affd. 565 F.2d 954↩ (5th Cir. 1978); Rule 90(f), (formerly Rule 90(e)).
4. The last job petitioner worked on during 1977 was located in New Haven, West Virginia. The job site was approximately 150 miles from his Virginia residence, and consequently, he did not commute on a daily basis between his Vinton, Virginia residence and the construction site in West Virginia.↩
5. The settlement date was three days after petitioner departed for Arizona with his family. Since neither petitioner nor his wife signed the settlement statement, we assume they did not attend the actual closing. Moreover, it is unclear, but we need not determine, whether the house in Virginia was owned by petitioner individually or whether petitioner and his wife owned it jointly. Petitioner claimed the house was his since he was the only wage earner and paid all of the expenses. In any event, Mrs. Krueger did not file a Federal income tax return for either of the years in issue, and petitioner conceded at trial that any income generated from the sale of the house is properly taxable to him. See n. 2, supra.↩
6. Petitioner testified that he also worked in California at some point in 1979. On brief petitioner claimed moving expenses from Louisiana to California and from California to St. Johns, Arizona for the period of about June 27, 1979 to August 1, 1979. These claims were based strictly on estimates. There is no evidence to support the claimed expenses, and there is no evidence as to the employment in California.↩
7. It was at this time that petitioner began taking his tax and legal advice from his co-workers, and the record does not show that any of them were lawyers or otherwise qualified to render such advice. In any event, petitioner began filing false W-4's and later Porth-type returns. See n. 2, supra.↩
8. For example, on September 19, 1978, petitioner filed a W-4 claiming 10 exemptions or allowances, and eight days later filed a W-4 claiming 40 exemptions or allowances. In the latter instance he filled out the rest of the form purporting to show why he was entitled to 40: he listed 4 exemptions, 1 special withholding for a non-working spouse, and 35 allowances for itemized deductions. He estimated itemized deductions of $29,850 with anticipated wages of $30,000. That statement was false, and petitioner knew it was false when he submitted it. It was in regard to that September 27, 1978 W-4 that Bechtel sent one of the warning letters. Petitioner never submitted a corrected Form W-4.↩
9. We note that during the taxable year 1978, Bechtel withheld from petitioner's wages Federal income tax in the amount of $1,219.22. However, on the Form 1040 submitted for that year, petitioner neither reported any amount of Federal income tax previously withheld nor claimed a refund with respect thereto.↩
10. Respondent determined that petitioner realized a long-term capital gain of $6,400 from the sale based on a selling price of $27,500 and a cost basis of $21,100. Petitioner argued at trial that the cost basis used by respondent did not reflect the improvements petitioner had made to the property. However, petitioner failed to present any evidence with respect to these improvements. After applying the section 1202 deduction (50 percent), respondent determined that petitioner received $3,200 of taxable gain in 1978. Respondent now concedes, however, that the computation of taxable gain should include the selling expenses petitioner incurred on the sale to the extent otherwise permitted to be taken into account. See nn. 2, 5, supra.↩
11. Respondent computed petitioner's tax liability for the taxable years in issue based on the filing status of married filing separately. He also allowed petitioner four exemptions in each of the taxable years (one for himself, one for his spouse, and two for his dependent children). At trial petitioner sought the benefits of joint filing status, but was advised by the Court that it was too late to make such an election. See section 6013(b)(2)(C).Cf. Phillips v. Commissioner,86 T.C. 433↩ (1986).
12. Petitioner has not raised and we have not considered whether the purchase of the trailer in June of 1978 constituted the purchase of a new principal residence entitling petitioner to nonrecognition treatment on the sale of his old residence pursuant to section 1034. In any event, the inadequate evidentiary record does not permit us to explore this issue.↩
13. Respondent also concedes that a deduction for sales tax will be allowed in the parties' Rule 155 computation in an amount determined from the optional state sales tax table.↩
14. In view of our holding on the temporary versus indefinite issue, we need not address respondent's alternative argument that petitioner was an itinerant worker who had no tax home, i.e., who carried his tax home with him wherever he went. We note, however, that petitioner testified that he moved 25 times in the period from 1978 to the time of trial.↩
15. Petitioner had two other employers in 1979 in addition to Bechtel. However, that fact was established by the deemed admissions as to the two additional items of wage income, not by any testimony by petitioner. The record does not establish where the Lambert Electric Company and the W.E. Mason Corporation were located, the nature of those projects, the duration of petitioner's employment there, whether petitioner was fired or laid off, or any other facts to permit the Court to determine the applicability of the involuntary separation exception.↩
16. Sections 217(b)(3)(A) and (B) provide: (A) Dollar limits. -- The aggregate amount allowable as a deduction under subsection (a) in connection with a commencement of work which is attributable to expenses described in subparagraph (C) or (D) of paragraph (1) shall not exceed $1,500. The aggregate amount allowable as a deduction under subsection (a) which is attributable to qualified residence sale, purchase, or lease expenses shall not exceed $3,000, reduced by the aggregate amount so allowable which is attributable to expenses described in subparagraph (C) or (D) of paragraph (1). (B) Husband and wife. -- If a husband and wife both commence work at a new principal place of work within the same general location, subparagraph (A) shall be applied as if there was only one commencement of work. In the case of a husband and wife filing separate returns, subparagraph (A) shall be applied by substituting "$750" for "$1,500", and by substituting "$1,500" for "$3,000". Since petitioner was the only wage earner in the family and his wife did not file a Federal income tax return for the 1978 taxable year, section 217(b)(3)(B) is not applicable. Sec. 1.217-2(b)(9)(v), Income Tax Regs.↩
17. Petitioner moved his family from Virginia to Arizona in June of 1978. Petitioner worked in St. Johns, Arizona for approximately three months prior to moving his family. Section 217(b)(1)(D) provides that proper moving expenses include meals and lodging while occupying temporary quarters in the general location of the new principal place of work during any period of 30 consecutive days after obtaining employment. The 30 consecutive day period is any one period of 30 consecutive days which can begin, at the option of the taxpayer, on any day after the day the taxpayer obtains employment in the general location of the new principal place of work. Sec. 1.217-2(b)(6), Income Tax Regs.↩ We are satisfied that petitioner incurred at least $200 expense for meals while occupying temporary quarters.
18. At trial, an issue was raised as to whether petitioner is entitled to claim the benefits of the community property laws of Arizona, Louisiana, or California for any income that petitioner earned while working in those states. However, there is nothing in the record to convince us that petitioner and his wife acquired a domicile in any of those states at any time during the years in issue. See Sonkin v. Commissioner,T.C. Memo. 1978-91. Petitioner has simply failed to meet his burden of proof on this issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Moreover, any belated claim of community property benefits may carry with it unanticipated burdens for petitioner and his spouse. Since Mrs. Krueger did not file a joint return with her husband and did not otherwise file returns those years, the years are still open for issuance of a statutory notice of deficiency and assessment of tax. Section 6501(c)(3) provides that in the case of a failure to file a return, the tax may be assessed or a proceeding in court for the collection of such tax may be begun without assessment "at any time." Moreover, the deductions and exemptions allowed to petitioner would then have to be apportioned between he spouses. If half of the income was Mrs. Krueger's income, it might well be that neither parent could claim the dependency exemptions for the children for neither parent would have furnished more than half of the support for the children. See Jorg v. Commissioner,52 T.C. 288 (1969); Ketcham v. Commissioner,T.C. Memo. 1982-637; Bruce v. Commissioner,T.C. Memo. 1970-359↩. Fortunately, we need not wade into this morass.
19. As in effect during the years in issue, section 6653(b) provided as follows: (b) Fraud. -- If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. Section 6653(b) was amended by section 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616-617, 1982-2 C.B. 462, 569, applicable to taxes the last date prescribed for payment of which is after September 3, 1982. The amendment placed the quoted language in sections 6653(b)(1) and (4), and added another addition to the tax in section 6653(b)(2)↩.
20. Petitioner testified that he filed his returns in a manner he thought the courts had held to be valid. However, petitioner is not a lawyer and he did not consult with a lawyer prior to filing his tax returns for the years in issue. He got his tax and legal advice from his co-workers at the Bechtel project, none of whom was qualified to render proper tax or legal advice. He stated he began his own investigation into the filing of tax returns after he was informed by his fellow workers that the information he reported on his tax returns could be turned over to the Department of Justice. He claims he received books and literature from mail order houses but at trial did not remember the name of any of these mail order houses. The Court found petitioner's explanation of his purported investigation and his purported concern about self-incrimination wholly unworthy of belief. Particularly since this case primarily involves W-2 wage income, we think petitioner's arguments are disingenuous to say the least. ↩
21. It is likely that his employer reported to the Internal Revenue Service the excessive allowances claimed on his W-4's, as Bechtel advised petitioner it would have to report. This reporting may well have triggered the later criminal investigation that was instituted at one point. However, that later investigation has nothing to do with petitioner's knowledge and intent at the time he prepared and filed the Forms 1040.↩