KAREL WATERMAN, CLARA WATERMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Waterman v. Commissioner
Docket Nos. 45258-86, 45282-86, 33228-87
United States Tax Court
T.C. Memo 1990-497; 1990 Tax Ct. Memo LEXIS 549; 60 T.C.M. (CCH) 797; T.C.M. (RIA) 90497; September 18, 1990, Filed *549 Decision will be entered under Rule 155. Mark D. Pastor, for the petitioners. Glorianne Gooding Jones, for the respondent. FAY, Judge. FAY
MEMORANDUM OPINION Although other issues are involved, the tax deficiencies determined in these cases arise primarily from a transaction between petitioners, Karel and Clara Waterman (Mr. Waterman and Mrs. Waterman, respectively), and the Trans-Pacific Capital Corporation (Trans-Pac). Initially, respondent determined the tax consequences arising from that transaction should be accounted for in petitioners' 1968 taxable year. Thus, in separate notices of deficiency mailed to petitioners respondent determined deficiencies in and additions to Federal income tax as follows: Petitioner Karel Waterman, docket No. 45258-86: Additions to tax, section
Year
Deficiency
6653(b) [1]
6654(a)
1959
$ 11,166.49
$  7,417.50
$   410.34
1963
189.00
94.50
--  1964
1,989.20
994.60
48.45
1965
4,681.38
2,340.69
123.82
1966
3,660.34
1,830.17
91.12
1968
46,987.57
23,493.79
1,464.38
Petitioner Clara Waterman, docket No. 45282-86: Additions to tax, section
Year
Deficiency
6651(a)(1)
6653(a) 6654(a) 1959
$ 11,358.50
$  3,761.25 $   752.25
$   421.25
1964
1,730.00
432.50 86.50
48.25
1965
4,422.18
1,105.55 221.11
123.82
1966
3,254.44
813.61 162.72
91.12
1968
46,845.17
11,711.29 2,342.26
1,459.82
After *550 issuing these notices of deficiency, respondent determined the Trans-Pac transaction should be accounted for in petitioners' 1963 taxable year instead. Accordingly, in a notice of deficiency mailed to Mrs. Waterman, respondent determined a deficiency in and additions to Federal income tax as follows: Petitioner Clara Waterman, docket No. 33228-87:
Additions to tax, section
Year
Deficiency
6651(a)(1)
6653(a) 6654(a) 1963
$ 81,471.00
$ 20,367.75 $ 4,073.55
$ 2,281.19 Because of this recharacterization of the Trans-Pac transaction as being taxable in 1963 instead of 1968, respondent filed an amended answer in Mr. Waterman's case, docket No. 45258-86, to increase the deficiency in and additions to tax determined with respect to Mr. Waterman's 1963 taxable year and decrease those determined with respect to Mr. Waterman's 1968 taxable year. With respect to docket No. 45282-86, respondent amended his answer only to decrease the deficiency in tax and additions to tax determined with respect to Mrs. Waterman's 1968 taxable year. In his amended answers, respondent's amended determinations of deficiencies in and additions to tax are as follows: Petitioner Karel Waterman, docket No. 45258-86: Additions to tax, section
Year
Deficiency
6653(b)
6654(a)
1963
$ 81,471.00
$ 40,735.50
$ 2,281.19
1968
142.00
71.20
4.25
Petitioner *551 Clara Waterman, docket No. 45282-86: Additions to tax, section
Year
Deficiency
6651(a)(1)
6653(a)
6654(a)
1968
$ 142.40
$ 35.64
$ 7.12
$ 4.25
Also in his amended answer in docket No. 45258-86, respondent determined alternative additions to tax against Mr. Waterman as follows: Alternative
Additions to tax, section
Year
6653(a)
6651(a)(1)
1959
$   558.33
$  2,791.62 1963
4,073.55
20,367.75 1964
99.46
497.30 1965
234.07
1,170.35 1966
183.02
915.09 1968
7.12
35.64 Respondent's original determination of deficiencies in and additions to tax concerning 1959, 1964, 1965, and 1966 has not been amended. After stipulations and concessions, the issues remaining for decision are: (1) the proper characterization of the 1963 transaction with Trans-Pac involving the Waterman Collection and the ensuing tax consequences; (2) whether petitioners failed to report $ 5,000 income from the sale of art in 1965; (3) whether petitioners failed to report $ 37,000 income from the sale of art in 1966; (4) whether petitioners are entitled to deductions for the cost of goods sold in excess of the amounts determined by respondent for the years at issue; and (5) whether petitioners are subject to the additions to tax determined by respondent. *552 For convenience, we will first make findings of fact and render an opinion on the determined deficiencies in tax. After deciding those issues, we will address respondent's determination of additions to tax for each petitioner. Some facts have been stipulated. The Stipulation of Facts, Supplemental Stipulation of Facts, and their exhibits are incorporated by reference. Resolution of the vast majority of issues raised concerning the deficiencies in tax depends upon whether the party bearing the burden of proof with respect to a particular item satisfied his burden. Generally, the burden of proof is upon petitioners. Rule 142. The burden of proof is upon respondent, however, with respect to any new matter, increases in deficiency, and affirmative defenses pleaded in the answer. Rule 142. In the case at hand, petitioners bear the burden of proof with respect to the deficiencies in tax determined for all of the years before us except to the extent those deficiencies were increased by respondent's amended answer. That is, by reason of his having amended his answers in Mr. Waterman's case, respondent bears the burden of proof with respect to the Trans-Pac transaction. However, because *553 respondent did not amend his answer in docket No. 33228-87 concerning Mrs. Waterman's 1963 taxable year, Mrs. Waterman bears the burden of proof with respect to all issues raised in that year, including the proper characterization of the Trans-Pac transaction. The end result is, with respect to the Trans-Pac transaction, respondent bears the burden of proof where Mr. Waterman is concerned, but Mrs. Waterman bears the burden of proof where she is concerned. Deficiencies in Tax
Petitioners moved from The Netherlands to the United States in October 1958. From June 1959 until 1969 petitioners continuously lived as husband and wife in either the State of California or the State of Nevada. California and Nevada are both community property states. Petitioners returned to The Netherlands in 1969. Petitioners resided in Europe at the time the petitions in these cases were filed. Trial of these cases was on July 25 and 26, 1989, in Pasadena, California. At the time of trial petitioners continued to reside in Europe. Petitioners did not personally appear for trial; they appeared through counsel only. During the years at issue, Mr. Waterman considered himself an appraiser and connoisseur *554 of fine art and an art historian. From 1954 until their move to this country, petitioners resided in Amsterdam, The Netherlands. During this time, Mr. Waterman was a self-employed art dealer operating a sole proprietorship known as "Het Syndicaat Der Hollandse Kunstschilders," i.e., The Syndicate of Dutch Painters. When petitioners first arrived in the United States in 1958, they brought with them approximately ten paintings. In 1959, petitioners had 35 to 45 additional paintings shipped to them from The Netherlands. Petitioners considered 25 of these additional paintings to be of special importance and value, and referred to them as "the Waterman Collection." Petitioners acquired the Waterman Collection while residing in Europe during the 10 to 15 years immediately following World War II. The Waterman Collection was comprised of the following paintings: 1. Rembrandt van Rhyn, John the Baptist before Herod and Salome 2. Anthony van Dyck, Portrait of a Man 3. Anthony van Dyck, Mocking of Christ as King of the Jews 4. Willem van der Velde, English Ships in a Harbor 5. Jan van Goyen, View of the Village of Scheveningen
6. Pieter Claesz, Breakfast Still-life 7. Maria van Oosterwyck, *555 Flower Still -life 8. Sir Joshua Reynolds, Portrait of Theophila Gwatkin 9. Jacob van Ruysdael, Landscape with Goats and Herder 10. Adriaen Brouwer, Pleasant Scene in a Tavern 11. Domenico Zampieri (Dominichino), Saint Peter 12. Isaac van Ostade, Landscape in Autumn 13. Godfried Schalcken, Old Woman and Child by Candlelight 14. Giovanni Barriere (Guercino), Portrait of a Young Girl 15. Jean Auguste Dominique Ingres, The Slave Market 16. Jacopo Giacomo Robusti (Tintoretto), Susan and the Elder 17. Studio of Thomas Gainsborough, Shepherd Boy with Dog and Goats in Landscape 18. Jacob Grimmer, Winterscape with Hunters 19. Andrea Del Sarto, Christ and the Woman at the Well 20. Andrea Del Castagno, The Crucifixion 21. Govaert Camphuyzen, The Love Letter 22. Adriaen van Gaesbeeck, Dutch Interior 23. Vittore Carpaccio, Madonna and Child, flanked by two Saints 24. Thomas Couture, The Arrest 25. Eugene Delacroix, Portrait of a Moroccan Princess All of the paintings petitioners owned, including the Waterman Collection, were held as stock in trade for sale in the ordinary course of Mr. Waterman's business as an art dealer. While residing in the United States, Mr. Waterman continued *556 in the business of selling art for profit. The parties stipulate Mr. Waterman received sales proceeds of $ 55,000 in 1959 from the sale of six paintings not part of the Waterman Collection to Mr. Eugene C. Kelly (Mr. Kelly), the singer, dancer, and movie actor. Some time after this purchase, Mr. Kelly consulted several art appraisers and discovered the six paintings sold to him by Mr. Waterman were forgeries worth only the value of the frames in which they were mounted. In January 1960, Mr. Waterman and his brother began operating a retail appliance store under the name 20th Century Appliances (20th Century). Mr. Waterman initially invested $ 30,000 cash in 20th Century. Within less than one year of his initial investment, Mr. Waterman withdrew $ 15,000 from 20th Century. 20th Century was only in business for approximately eleven months. During that time Mr. Waterman and his brother employed an accountant to keep 20th Century's books and records and to file its tax returns. On November 29, 1960, an Involuntary Petition of Bankruptcy was filed in the United States District Court for the Southern District of California captioned "In the Matter of Karel Waterman, doing business *557 under the fictitious firm name of 20th CENTURY APPLIANCES." On May 18, 1961, Mr. Waterman filed a Debtor's Petition of Bankruptcy (the Bankruptcy Petition) with respect to that matter. Mr. Waterman listed in the Bankruptcy Petition what purported to be a true and accurate inventory of his assets. Mr. Waterman represented his stock in trade included the following items held by him on consignment: CONSIGNMENTS
1.
Rembrandt, Herod Salome and John
$ 50,000.00
2.
van Dyck, Portr. of a man
15,000.00
3.
van Dyck, Mockinge (sic) of Christ
10,000.00
4.
van der Velde, Sea-scape (sic)
15,000.00
5.
van Goyen, Landscape
10,000.00
6.
P. Claesz, Stillife (sic)
10,000.00
7.
van Oosterwyck, Flower stillife (sic)
3,000.00
8.
Reynolds, Portrait of a Girl
4,000.00
9.
van Ruysdael, Landscape
12,000.00
10.
Brouwer, Peasants
3,000.00
11.
Dominicino, St. Peter
5,000.00
12.
van Ostade, Landscape
10,000.00
13.
Schalcken, Woman and child
2,000.00
14.
Guercino, Portrait of a Girl
4,000.00
15.
Ingres, The Slayer
5,000.00
16.
Tinteretto, Suzanne and the Elder
9,000.00
17.
Gainsborough, Landscape with boy
3,000.00
18.
Jacob Grimmer, Winter landscape
6,000.00
19.
Andrea Delsarto, Christ and the Woman
12,000.00
20.
Tiepolo, The Mass
7,000.00
21.
Pietro Longhi, Portrait of a Woman
4,000.00
*558 Mr. Waterman's Bankruptcy Petition was false. At least the first 19 of the paintings listed as being held on consignment were part of the Waterman Collection owned outright by petitioners. In 1962, Mr. Waterman encumbered the Waterman Collection as security for a $ 100,000 loan from William R. Ward (Mr. Ward). As security for the loan, Mr. Waterman gave Mr. Ward physical possession of the Waterman Collection. In 1963, Mr. Waterman began negotiating for the sale of the Waterman Collection with representatives of Brigham Young University (BYU). The negotiations culminated in an oral offer from BYU to buy the Waterman Collection for $ 1,400,000. BYU proposed to pay petitioners the purchase price as follows: $ 600,000 in the first year of sale, and $ 400,000 in each of the second and third years following the sale. As a prerequisite to the sale, BYU required Mr. Waterman be able to deliver physical possession of the Waterman Collection. Mr. Waterman could not provide BYU with possession as required, however, so long as Mr. Ward's 1962 loan to petitioners was unpaid and Mr. Ward retained possession of the Waterman Collection. Accordingly, after receiving BYU's offer to purchase the *559 Waterman Collection, Mr. Waterman began looking for capital with which to satisfy his obligation to Mr. Ward. Mr. Waterman's search for capital led him to Trans-Pac. After negotiations, a deal was struck on March 21, 1963, between Mr. Waterman and Trans-Pac. That transaction is the primary subject of the dispute concerning petitioners' 1963 taxable year. The transaction between Mr. Waterman and Trans-Pac is evidenced by three documents referred to as: (1) the Joint Adventure Agreement; (2) the Bill of Sale; and (3) the Supplement to Joint Adventure Agreement (the Supplement Agreement). Under the terms of the Joint Adventure Agreement, Mr. Waterman and Trans-Pac formed a joint venture (the Joint Venture) for the purpose of effecting the sale of the Waterman Collection to BYU. The Joint Adventure Agreement provided a method by which Mr. Waterman and Trans-Pac proposed to create the Joint Venture and accomplish its purpose. This method can be summarized as follows: (1) Trans-Pac was to contribute $ 250,000 to the Joint Venture. This amount was to be used to satisfy any debts owed by Mr. Waterman and secured by his interest in the Waterman Collection. Any amount remaining of Trans-Pac's *560 contribution after satisfaction of these debts was to be paid Mr. Waterman. (2) After obtaining possession of the Waterman Collection from Mr. Ward, Mr. Waterman was to contribute it to the Joint Venture by executing a Bill of Sale in favor of, and conveying title to the Waterman Collection to, Trans-Pac. Thereafter, the Waterman Collection was to belong to Trans-Pac and remain in its possession until one year after execution of a sales agreement with BYU. It was anticipated a sales agreement with BYU would be executed some time within 60 days after March 21, 1963, the date the Joint Adventure Agreement was executed. (3) Mr. Waterman and Trans-Pac further anticipated BYU would pay $ 600,000 to the Joint Venture and receive possession of the Waterman Collection one year after executing the anticipated sales agreement. BYU's $ 600,000 payment was to belong exclusively to Trans-Pac but, upon its receipt, Trans-Pac was to make an additional contribution of $ 250,000 to the Joint Venture for a total contribution of $ 500,000. Immediately upon this second $ 250,000 contribution to the Joint Venture by Trans-Pac, a distribution of $ 250,000 was to be made by the Joint Venture to Mr. Waterman. *561 (4) It was anticipated BYU would pay the remainder of the purchase price, $ 800,000, to the Joint Venture in two installments of $ 400,000 each on the second and third anniversaries of the execution of the sales agreement. BYU's two $ 400,000 payments were to be divided equally between Mr. Waterman and Trans-Pac. (5) If BYU defaulted in the purchase of the Waterman Collection and did not pay the first installment of $ 600,000, the Joint Adventure Agreement provides: [Trans-Pac] shall, without notice, and at public or private sale, by parcels or by lot, sell and liquidate The Waterman Collection and from the proceeds thereof pay itself the sum of $ 600,000.00 and pay the excess to [Mr. Waterman] after expenses of sale including reasonable attorneys fees if any. [Mr. Waterman] may be a purchaser at such sale.
On March 21, 1963, pursuant to their Joint Adventure Agreement, Trans-Pac paid $ 150,000 to Mr. Ward in satisfaction of the debt owed him by Mr. Waterman. On March 22, 1963, Trans-Pac paid directly to Mr. Waterman $ 74,180. Further, between March 21 and April 20, 1963, Trans-Pac paid approximately $ 22,309.50 in satisfaction of various other debts Mr. Waterman owed. [2] *562 On March 21, 1963, in consideration for these payments and pursuant to his obligation under the Joint Adventure Agreement, Mr. Waterman executed a Bill of Sale in favor of Trans-Pac with respect to the Waterman Collection. The Bill of Sale states: Know all men by these presents, that I, KAREL WATERMAN, * * * in consideration of $ 250,000.00 to me or to my designee paid by TRANS-PACIFIC CAPITAL CORPORATION, * * * the receipt whereof is hereby acknowledged, do hereby grant, bargain and sell to the said TRANS-PACIFIC CAPITAL CORPORATION, the following described goods and chattels: A collection of 25 masterpiece paintings known as THE WATERMAN COLLECTION * * *. To have and to hold all and singular the said goods *563 and chattels to the said Trans-Pacific Capital Corporation, its successors and assigns, to its own use forever.
On March 21, 1963, Trans-Pac and Mr. Waterman also executed the Supplement Agreement. That document provides: Should no sale of The Waterman Collection to Brigham Young University be consummated within 60 days from March 21, 1963, it is agreed that [Trans-Pac] shall convey back to [Mr. Waterman] said Waterman Collection in its entirety upon the following terms: [Mr. Waterman] shall pay [Trans-Pac] $ 40,000.00 on the 61st day after March 21, 1963, and a like sum of $ 20,000.00 each month thereafter on the 23rd day thereof until a total of $ 240,000.00 has been paid. On March 21, 1964, [Mr. Waterman] will pay [Trans-Pac] $ 250,000.00. Upon receipt of said sums in full, [Trans-Pac] shall execute a Bill of Sale and make physical delivery of the said collection to [Mr. Waterman]. * * *
Trans-Pac treated this transaction as an outright purchase of Mr. Waterman's entire interest in the Waterman Collection. Trans-Pac represented to third parties it held exclusive right, title, and interest to the Waterman Collection. Based upon those representations, on April 14, 1963, Trans-Pac *564 mortgaged the Waterman Collection as security for a $ 500,000 loan from the Bank of Tokyo. To effect the loan, Trans-Pac executed in favor of the Bank of Tokyo a collateral, interest-bearing promissory note with an assigned warehouse receipt relating to the Waterman Collection. Trans-Pac also executed with the Bank of Tokyo a security agreement and a mortgage of chattels covering the Waterman Collection. The $ 500,000 Trans-Pac received from the Bank of Tokyo was retained by Trans-Pac for its own use and benefit. Because the Bank of Tokyo had a security interest in the Waterman Collection, and because the Waterman Collection was effectively in the Bank of Tokyo's possession, the contemplated sale to BYU was frustrated and could not be completed by the Joint Venture. On October 15, 1963, Trans-Pac defaulted on its $ 500,000 promissory note executed in favor of the Bank of Tokyo. In 1964, Mr. Waterman filed suit for the return of the Waterman Collection against, among others, Trans-Pac, its principal officers, and the Bank of Tokyo. The litigation was ultimately settled between Mr. Waterman and the Bank of Tokyo in 1968. [3] *565 The first issue for decision is the proper characterization of the 1963 transaction with Trans-Pac and its ensuing tax consequences for petitioners. Petitioners assert the transaction in question was, in substance, a financing arrangement -- i.e., a loan from Trans-Pac to Mr. Waterman -- through the medium of the Joint Venture. Petitioners contend this "loan" was intended to be in the total amount of $ 500,000, comprised of the $ 250,000 petitioners received upon execution of the Bill of Sale plus another $ 250,000 petitioners were going to receive if and when BYU made its initial payment of $ 600,000. Petitioners assert their entire transaction with Trans-Pac was contingent in nature and was not to be considered complete unless and until BYU purchased the Waterman Collection from the Joint Venture. Petitioners assert if the sale of the Waterman Collection to BYU occurred, under the terms of their "loan" Trans-Pac was to recover the $ 500,000 *566 "advanced" plus an additional $ 500,000 of "interest" within approximately three years after the sale. If the sale to BYU did not occur, petitioners argue they had an absolute obligation under the Supplement Agreement to repurchase the Waterman Collection from Trans-Pac for $ 490,000. Petitioners rely upon this purported obligation to reacquire the Waterman Collection in attempting to establish they had a duty to repay their "loan" from Trans-Pac. Petitioners argue the $ 490,000 they were thus "obligated" to pay to reacquire the Waterman Collection was intended to consist of a $ 250,000 repayment of principal "loaned" petitioners upon their execution of the Bill of Sale, plus a "finance fee" of $ 240,000 to Trans-Pac for this "loan." Petitioners argue the Bill of Sale was nothing more than a security device, and their transfer of the Waterman Collection to Trans-Pac was merely a collateral arrangement by which Trans-Pac was given title to, and possession of, the Waterman Collection as security for its "loan" to petitioners. Despite appearing to have disposed of their entire interest in the Waterman Collection to Trans-Pac, and even though they received the benefit of payments totaling *567 $ 250,000, petitioners contend their 1963 transaction with Trans-Pac was entirely contingent in nature. Based on this, petitioners assert they had no income in 1963 from their transaction with Trans-Pac. Respondent contends the transaction between petitioners and Trans-Pac can be characterized as either: (1) an outright sale of the entire Waterman Collection to Trans-Pac by petitioners for a price of $ 250,000; or (2) a transaction in which petitioners created the Joint Venture, contributed the Waterman Collection to the Joint Venture, and received an immediate distribution of $ 250,000 from the Joint Venture.
In large part, respondent bases his alternative interpretations of the transaction upon the three documents Trans-Pac and Mr. Waterman executed -- i.e., the Joint Adventure Agreement, the Bill of Sale, and the Supplement Agreement. Respondent asserts either of his alternative characterizations reflect the substance of petitioners' transaction. Both of respondent's alternative characterizations of the transaction in question result in income of $ 250,000 to petitioners in 1963. A transaction's tax consequences are generally determined by the substance of the transaction and *568 not merely the form in which it is cast. Commissioner v. Court Holding Co., 324 U.S. 331 (1945).The substance of a transaction is generally determined by reference to the totality of the circumstances surrounding the transaction, with particular attention paid to the intent of the transacting parties. United States v. Cumberland Public Service Co., 338 U.S. 451 (1950).In determining the transacting parties' intent, the form of the transaction in question, although not determinative, is important. This is because, presumably, transacting parties will not structure a transaction in a way that does not reflect their intentions. See Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967). We do not agree with petitioners' characterization of their transaction as being contingent in nature. Petitioners' characterization is based entirely upon an interpretation of the Supplement Agreement which is unsupported by the evidence. Petitioners' argument is also made without any consideration for the provisions of the other two documents evidencing the transaction, the Joint Adventure Agreement and the Bill of Sale. In short, petitioners' characterization of their transaction is completely *569 contrary to the form in which it was cast. If the sale to BYU did not occur, the Joint Adventure Agreement purports to impose upon Trans-Pac an obligation to dispose of the Waterman Collection, "without notice, and at public or private sale, by parcels or by lot." At the same time, the Supplement Agreement purports to impose upon Mr. Waterman an obligation to reacquire the Waterman Collection if the sale to BYU did not occur. Considering together these two documents and the conflicting obligations they seem to impose, we conclude the Supplement Agreement gave petitioners, at most, a right of first refusal to reacquire the Waterman Collection from Trans-Pac in the event the sale to BYU did not occur. The documents do not impose upon petitioners an absolute obligation to reacquire the Waterman Collection if the sale to BYU did not take place. We also do not agree with respondent's characterizations of the transaction as an outright sale by petitioners of their entire interest in the Waterman Collection, or as a contribution of the Waterman Collection to the Joint Venture with an immediate distribution to petitioners. Although petitioners gave Trans-Pac legal title to and possession *570 of the Waterman Collection, this was done by petitioners only for purposes of facilitating the Joint Venture's ultimate sale of the Waterman Collection to BYU or some other third-party purchaser. We find petitioners intended to retain for themselves a beneficial interest in the Waterman Collection after their apparent transfer of the Waterman Collection to Trans-Pac. This is shown by petitioners' retention of an interest in the amounts to be received by Trans-Pac when the Waterman Collection was ultimately sold. The transaction was in substance a sale by petitioners of a partial interest in the Waterman Collection to Trans-Pac for $ 250,000. At the time they disposed of this partial interest in the Waterman Collection, petitioners intended to form a joint venture with Trans-Pac for the sole purpose of effecting a sale of the Waterman Collection. It was anticipated petitioners and Trans-Pac would each contribute their respective partial interests in the Waterman Collection to the Joint Venture, and the Joint Venture would then consummate the sale to BYU for a price of $ 1,400,000. In the Joint Adventure Agreement, petitioners and Trans-Pac provided for a series of contributions *571 to the Joint Venture by Trans-Pac and distributions from the Joint Venture to petitioners. As a result of these contributions to and distributions from the Joint Venture, the proceeds from the sale to BYU were ultimately to be divided between petitioners and Trans-Pac as follows: BYU's Payment
Petitioners' Share
Trans-Pac's Share
$    600,000.00
$ 250,000.00
[4] $ 350,000.00  400,000.00 200,000.00
200,000.00  400,000.00 200,000.00
200,000.00  1,400,000.00 650,000.00
750,000.00  Petitioners anticipated realizing a total of $ 900,000 from their disposition *572 of the Waterman Collection, $ 250,000 received from Trans-Pac for its partial interest plus $ 650,000 of the proceeds from the ultimate sale to BYU. Trans-Pac anticipated realizing $ 750,000 from the disposition of its partial interest which it acquired from petitioners for $ 250,000. Based on their agreement for the division of the proceeds from the sale to BYU, petitioners retained a 46.43 percent ownership interest [5] in the Waterman Collection after selling a partial interest to Trans-Pac. Correlatively, Trans-Pac acquired a 53.57 percent ownership interest in the Waterman Collection from petitioners. At the time they sold a partial interest in the Waterman Collection to Trans-Pac, petitioners held it primarily for sale to customers in the ordinary course of Mr. Waterman's *573 trade or business as an art dealer. Thus, the Waterman Collection was inventory in petitioners' hands. See sec. 1221(1). Accordingly, any gain petitioners recognized in disposing of the Waterman Collection is taxable to them as ordinary income. From their disposition of a partial interest in the Waterman Collection to Trans-Pac, petitioners must recognize gain to the extent the amount realized exceeds their basis in that partial interest at the time it was sold. Sec. 1001(a). Respondent determined petitioners' basis in the Waterman Collection was zero during the years in question. Petitioners assert their basis in the Waterman Collection was $ 100,000 in 1963. The record in these cases is void of any credible evidence concerning petitioners' basis in the Waterman Collection at the time of the Trans-Pac transaction in 1963. The record does contain a sworn statement given by Mr. Ward to agents of respondent's Intelligence Division on June 17, 1969. This statement concerns estimations of the value of the Waterman Collection in 1962 and has no relevance on the issue of petitioners' basis. The record also contains testimony by Robert Bernstein (Mr. Bernstein), the attorney representing *574 petitioners in the suit against Trans-Pac, et al., filed in 1964. Mr. Bernstein testified, "it was sort of common practice for Mr. Waterman to mark up his paintings about a hundred percent of his cost as a sale price." While this testimony may be relevant to the issue of petitioners' basis in the Waterman Collection, we give it no weight for purposes of decision. The only other evidence presented relevant to the issue of petitioners' basis consists of a "Memorandum of Interview" written by a revenue agent and a special agent of respondent after they questioned Mr. Waterman on September 29, 1969. In that document, respondent's agents noted that Mr. Waterman told them he purchased the Waterman Collection in the early 1950's for a total cost of approximately $ 100,000. We believe respondent's agents accurately recorded Mr. Waterman's statement. However, considering its self-serving nature, we place no weight whatsoever on Mr. Waterman's heresay statement of basis. Because of the status of the record in these cases, we have no credible evidence upon which to make a finding of fact concerning petitioners' basis in the Waterman Collection. Further, without any relevant and credible *575 evidence concerning basis, we are also unable to make an estimate of petitioners' basis using the principles of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In the absence of evidence upon which to make a finding of fact or a reasonable estimate of petitioners' basis, we must hold against the parties bearing the burden of proof of that issue. As discussed above, with respect to Mr. Waterman, in docket No. 45258-86, respondent bears the burden of proof on the Trans-Pac transaction. Respondent failed to carry the burden of proof and Mr. Waterman's assertion of a basis of $ 100,000 must be sustained for purposes of docket No. 45258-86. In her own case, docket No. 33228-87, Mrs. Waterman bears the burden of proof with respect to the Trans-Pac transaction. Mrs. Waterman failed to carry her burden and respondent's assertion of a basis of zero must be sustained. Accordingly, taking into consideration the different burdens of proof in each of these cases, Mr. Waterman must recognize ordinary income in 1963 to the extent his undivided one-half share of the amount realized in the Trans-Pac transaction exceeds his share of the basis *576 in his undivided one half interest in that portion of the Waterman Collection sold to Trans-Pac. Mrs. Waterman must recognize ordinary income in 1963 to the full extent of her undivided one-half share of the amount realized in the Trans-Pac transaction. The second issue for decision is whether petitioners failed to report $ 5,000 income from the sale of art in 1965. Respondent determined Mr. Ward made a down payment of $ 5,000 in 1965 toward the purchase of some furniture and other artifacts from Mr. Waterman. Respondent also determined Mr. Ward paid this amount to a third party upon Mr. Waterman's instructions and behalf. Although they contend respondent is incorrect to include this item in their 1965 income, petitioners did not present any evidence suggesting respondent's determination is not entitled to a presumption of correctness, and petitioners failed to bear their burden of proof on this issue. Accordingly, we sustain respondent's determination of a deficiency in tax in this respect. The parties stipulate petitioners are entitled to a deduction of $ 14,358.80 for the cost of goods sold in 1965. On brief, respondent stated he would concede an additional $ 5,000 deduction *577 for the cost of goods sold in 1965 if petitioners were found to have an additional $ 5,000 unreported income in that year from the down payment Mr. Ward made for the purchase of furniture and other artifacts. Accordingly, petitioners are entitled to a deduction of $ 19,358.80 for the cost of goods sold in 1965. Further, petitioners are entitled to a deduction of $ 500 in 1965 for receivership expenses paid in connection with the bankruptcy of 20th Century. The third issue for decision is whether petitioners failed to report $ 37,000 income from the sale of art in 1966. Mr. Waterman sold seven paintings to Mr. Ward for $ 21,000 in 1966. Also in that year Mr. Ward completed the purchase of furniture and other objects of art from Mr. Waterman for which Mr. Ward made a down payment in 1965. In completion of this sale, Mr. Ward paid an additional $ 15,000 to and on behalf of Mr. Waterman in 1966. Although he did not have the burden of proof on these items, respondent provided substantial evidence to support his determination said amounts were taxable to petitioners. Moreover, petitioners failed to produce any credible evidence to rebut respondent's assertions. Accordingly, we conclude *578 petitioners had additional income of $ 36,000 ($ 21,000 + $ 15,000) [6] in 1966. The last issue for decision concerning the deficiencies in tax is whether petitioners are entitled to a deduction for the cost of goods sold in any of the years at issue in excess of the amounts stipulated. Except with respect to the Trans-Pac transaction as it relates to Mr. Waterman's tax liability, petitioners bear the burden of proof with respect to the deficiencies in tax determined in these cases. Petitioners have provided no credible evidence on the issue of the cost of the goods sold by them in the years at issue. Accordingly, except as previously discussed with respect to petitioners' 1965 tax year, petitioners are not entitled to any deductions for the cost of goods sold in excess of the amounts stipulated. Additions to Tax
Having made our findings with respect to petitioners' tax deficiencies for the years at issue, the only issue remaining for decision *579 is whether petitioners are subject to the additions to tax determined by respondent. A discussion of this issue follows. Mr. Waterman possessed a good command of the English language during the years in issue. [7] From his many years as a self-employed art dealer in Amsterdam and the United States, Mr. Waterman was also familiar with the economic concepts of profit and gain from the sale of art. Although Mr. Waterman and his brother engaged an accountant to keep 20th Century's books and records and to file its tax returns, no return for 20th Century was offered into evidence to show one was filed. Further, petitioners did not file any individual Federal income tax returns for any year in issue. Throughout the periods in dispute, Mr. Waterman thought he and his wife might have an obligation to file Federal income tax returns. However, neither he nor Mrs. Waterman ever *580 took any affirmative steps to determine their tax obligations in the United States. In fact, Mr. Waterman did not file income tax returns or pay income taxes to any country from, at least, 1962 until 1968. In a sworn statement made to respondent's special agents on January 13, 1969, with respect to his understanding of the requirements for filing income tax returns in the United States, Mr. Waterman stated, "I still feel that I did something wrong, that I had to file something or should have a good auditor go over all the things with me, and I postponed it all the time." Despite feeling he was wrong to not file any income tax returns, Mr. Waterman further exacerbated his failure to file by also failing to maintain books and records of his commissions, purchases, or sales of art to customers. Mr. Waterman's only explanation for his failure to file was that he thought he did not have any net profits upon which tax could be imposed. Respondent began investigating petitioners in the fall of 1968. When first questioned by respondent's agents concerning his failures to file, Mr. Waterman gave vague and inconsistent answers. Specifically, when questioned by respondent's agents about *581 his business dealings in the United States, Mr. Waterman lied and alleged he made only a single art sale while in this country. Subsequently, when interviewed on September 29, 1969, Mr. Waterman admitted giving respondent's agents false and misleading information in his previous interviews. Mr. Waterman only admitted making the false statements after being confronted with the contradictory testimony of Mr. Ward. In March 1972, two Bills of Indictment were returned against Mr. Waterman in the United States District Court for the Central District of California for alleged violations of section 7203, for his alleged failure to file individual income tax returns for tax years 1965 and 1966. These indictments were dismissed in February 1980. In the notice of deficiency in docket No. 45258-86, respondent determined Mr. Waterman was liable under section 6653(b). Under that section, if any part of an underpayment in tax is due to fraud, there is imposed an addition to tax equal to 50 percent of the underpayment. Fraud is generally defined as an intentional wrongdoing by the taxpayer designed to evade the payment of tax believed to be owing. Professional Services v. Commissioner, 79 T.C. 888, 930 (1982). *582 Fraud is never to be imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). Whether fraud was committed by a taxpayer is a question of fact to be answered upon consideration of the totality of the circumstances. Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). In general, respondent has the burden of establishing, by clear and convincing evidence: (1) an underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654 (1990), and the cases cited therein; sec. 7454(a); Rule 142(b). Respondent has satisfied the first of these two requirements. [8] As to the second requirement, since direct evidence of a taxpayer's fraudulent intent is rarely available, respondent may draw reasonable inferences from the facts and may rely upon circumstantial evidence in order to meet his burden of proof. Spies v. United States, 317 U.S. 492, 499 (1943).Further, the taxpayer's entire course of conduct may be considered to determine if he or she had the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); *583 Otsuki v. Commissioner, supra at 105-106. A consistent failure to report substantial amounts of income constitutes effective evidence of fraudulent intent. Lollis v. Commissioner, 595 F.2d 1189, 1191-1192 (9th Cir. 1979); Wilson v. Commissioner, 76 T.C. 623, 633 (1981).This type of evidence is even stronger where the failure to report is consistent over a number of years. Otsuki v. Commissioner, supra.Further, other indications ("badges") of fraud may also be considered, including but not limited to: the making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); the filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, failure to cooperate with tax authorities, and concealment of assets, Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. When considering the totality of the *584 circumstances of this case, Mr. Waterman has displayed a pattern of conduct from which an inference of fraudulent intent may be drawn. Some of the indications of Mr. Waterman's fraudulent intent are: (1) his failure to maintain any books and records of his sales of art during the years at issue; (2) his failure to file income tax returns for any of his years of residency in the United States; (3) his giving vague, misleading, and false information to respondent's agents when questioned about the extent of his art sales; and (4) his filing a false Bankruptcy Petition with the United States District Court for the Southern District of California, which in effect was a concealment of petitioners' assets. The first three of these badges of fraud displayed by Mr. Waterman touch upon each and every year in dispute. Further, this is byno means an exclusive list of the badges of fraud displayed by Mr. Waterman. Based on these indications of fraud, we find Mr. Waterman is subject to the addition to tax under section 6653(b) as determined by respondent. Respondent also determined Mr. Waterman was liable for the addition to tax under section 6654(a). That section imposes an addition to tax *585 for a failure by an individual to make estimated tax payments. Mr. Waterman made no tax payments with respect to any of the years at issue and is subject to this addition to tax. By amended answer, respondent alternatively asserted Mr. Waterman was subject to the additions to tax provided by sections 6653(a) and 6651(a). Because we determined Mr. Waterman is liable for the additions to tax under sections 6653(b) and 6654(a), we need not address this alternative determination by respondent. The additions to tax respondent determined against Mrs. Waterman are those under sections 6651(a)(1), 6653(a), and 6654(a). Section 6651(a)(1) imposes an addition to tax in the case of a failure to file a tax return, unless the failure to file is shown to be due to reasonable cause and not willful neglect. Section 6653(a) imposes an addition to tax if any part of an underpayment in tax is due to negligence or an intentional disregard of rules and regulations. Section 6654(a), as discussed above, imposes an addition to tax for a failure by an individual to make estimated tax payments. Mrs. Waterman admits she did not file tax returns, or make estimated tax payments for the years in question. *586 Mrs. Waterman argues she is not subject to the additions to tax for failing to file and for negligence, however, because she had no reason to know Mr. Waterman had income from his business activities in the United States, and because she had no reason to know she had an obligation to file and report any of the income Mr. Waterman realized. The burden of proof is upon Mrs. Waterman with respect to the additions to tax determined against her. Delaney v. Commissioner, 743 F.2d 670, 672 (9th Cir. 1984), affg. T.C. Memo. 1982-666; Rule 142. Mrs. Waterman failed to present any credible evidence with respect to the additions to tax determined against her for failing to file and for negligence. Accordingly, respondent's determination on those items is presumed correct and is sustained. Further, Mrs. Waterman made no argument with respect to, and thus concedes, the addition to tax for failing to make estimated tax payments. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Although respondent's evidence supports finding only $ 246,489.50 ($ 150,000.00 + 74,180.00 + 22,309.50) was paid to or on behalf of petitioners by the Trans-Pacific Capital Corporation (Trans-Pac), respondent asserts $ 250,000 was the amount Trans-Pac paid in 1963. Petitioners do not take issue with the amount↩ paid by Trans-Pac. Petitioners dispute only respondent's characterization of that amount as being income. Accordingly, we will use the $ 250,000 figure for purposes of decision.
3. In 1968, a settlement was reached between petitioners and the Bank of Tokyo. As a result of the settlement and in exchange for petitioners' payment of $ 30,000, the Bank of Tokyo transferred to petitioners the Waterman Collection, its security interest therein, and Trans-Pac's $ 500,000 promissory note.
4. Pursuant to the Joint Adventure Agreement, Brigham Young University's (BYU) initial payment of $ 600,000 for the Waterman Collection was to belong exclusively to Trans-Pac. However, immediately upon receipt of that payment Trans-Pac was required to pay $ 250,000 to the joint venture formed with petitioners (the Joint Venture). Immediately upon the Joint Venture's receipt of this second contribution from Trans-Pac, the Joint Venture was to make a distribution of a like amount to petitioners. Thus, of the initial $ 600,000 payment from BYU, Trans-Pac was to retain $ 350,000 and petitioners were to receive, through the Joint Venture, $ 250,000.↩
5. This is determined by dividing the amount of proceeds petitioners were to receive from the sale to BYU by the total proceeds to be received from the sale, i.e., dividing $ 650,000 by $ 1,400,000. Trans-Pac's percentage interest can also be determined by dividing its share of the proceeds from the sale to BYU by the total proceeds to be received from the anticipated sale, i.e., $ 750,000 dividend by $ 1,400,000.↩
6. Respondent asserted petitioners had additional income in 1966 in the amount of $ 37,000. Because respondent's evidence supports a finding of additional income in the amount of $ 36,000↩ only, we must assume respondent made a mathematical error.
7. Mr. Waterman did not testify before this Court. We reach our conclusion concerning Mr. Waterman's command of the English language based upon the testimony of Mr. Eugene C. Kelly, and an examination of the sworn statement Mr. Waterman gave to two special agents of respondent's Intelligence Division on January 13, 1969.↩
8. Petitioners stipulate they did not file Federal income tax returns for any year in dispute. Further, we find tax due in each of those years.↩